**David HOFF, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2010–SC–000167–MR.

Supreme Court of Kentucky.

Dec. 22, 2011.

Emily Holt Rhorer, Department of Public Advocacy, Frankfort, KY, for appellant.

Jack Conway, Attorney General, Bryan Darwin Morrow, Office of the Attorney General, Frankfort, KY, for appellee.

Opinion of the Court by Justice NOBLE.

Appellant David Hoff was convicted by a Christian County jury of eight counts of first-degree rape and eight counts of incest. Appellant was given a life sentence. Because of the extensive use of inadmissible hearsay and the impermissible bolstering of the victim's testimony, this Court reverses the convictions and remands for a new trial.

## I. BACKGROUND

This case arose when B.H., who was then twelve years old, reported that Appellant, her father, had raped her repeatedly since she was four years old. B.H. lived with Appellant and other family members in Christian County, Kentucky. The family relationships in this case are complicated, but a brief summary is appropriate because several family members testified at trial.

Appellant and Marilyn Benedict have lived together since 1984 as husband and wife, although they are not legally married. Appellant has three children with Benedict: David Jr., Tiffany, and Matthew.

Appellant raped Benedict's adult daughter from a previous relationship, Angela Green, on many occasions, resulting in the birth of three children: B.H. (daughter born 1995, and the victim in this case), Ju.H. (son born 1998), and Je.H. (daughter born 2003).[1] B.H. was told that Benedict was her mother rather than Green, although B.H. eventually found out that Green is her real mother. B.H. always knew Appellant to be her father.

The entire family, including Appellant, Marilyn Benedict and her three children with Appellant, Angela Green and her three children with Appellant, and the girlfriends and children of Matthew and David, lived in a three-bedroom trailer and an outbuilding in Christian County.

B.H., who was fourteen years old at the time of the trial, testified that Appellant

---

1. Appellant was convicted in a separate trial of three counts of first-degree rape of Green, and this Court affirmed the convictions in *Hoff v. Commonwealth,* 2009–SC–000480. No information about Appellant's crimes against Green was introduced in the guilt phase of the present case.

had sexually abused her since she was a small child. She said Appellant would make her take her clothes off and then have sex with her. Appellant would get on top of her and put his "thing" in her. Before she got her own bedroom when she was eight or nine, she would sleep with Benedict and Appellant, and Appellant would rub her stomach, pull her pants down, play with her "privates," and put his "thing" in her. Appellant began homeschooling B.H. in third or fourth grade, but instead of schoolwork, he would actually make her do things sexually.

B.H. said that the abuse happened more than once a week from when she was five or six years old until she was removed from the home in December 2007, when she was twelve. Although she could clearly remember the abuse from when she was five or six years old, she also believed that it happened before that, but she had only vague memories.

In December 2007, B.H. told her teacher what was happening to her. A social worker talked to her and she was removed from the home. In the next few weeks, she was interviewed by Detective Kent Roberts, and she underwent a physical examination by Dr. Travis Calhoun.

Appellant was charged with eight counts of rape and eight counts of incest. Each count corresponded to one calendar year (for example, "January 1, 2000—December 31, 2000") from when B.H. was four to when she turned twelve on April 19, 2007. The jury found Appellant guilty of all counts and recommended the sentence of

life for each of the rape convictions, the maximum sentence of ten years for six of the incest convictions, and the maximum sentence of life for the other two incest convictions.[2]

Appellant now challenges his convictions before this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. ANALYSIS

Appellant raises a number of issues on appeal. This opinion first addresses his claim that Dr. Calhoun was allowed to impermissibly bolster B.H.'s testimony. As in many child sex abuse cases, this case hinges on the credibility of the child victim, B.H., as there was limited physical evidence of the crimes. Because of the extensive use of inadmissible hearsay and impermissible bolstering in Dr. Calhoun's testimony, reversal is required.

This opinion then addresses Appellant's other claims that are likely to occur again on retrial.

### A. Dr. Calhoun's Testimony

Dr. Calhoun examined B.H. on December 20, 2007. He testified at trial and his forensic examination report was introduced into evidence. Dr. Calhoun testified that B.H. told him that her father had had sex with her since she was four years old, and that he had engaged in other inappropriate sexual touching. Dr. Calhoun said that during the examination, B.H. was withdrawn and emotionally traumatized, and it was hard to get her to answer his questions.[3] He saw a cut on B.H.'s arm

---

**2.** The penalty range for incest changed on July 12, 2006. Incest that occurred prior to that date resulted in a Class C felony conviction, while incest committed on a victim less than twelve years of age that occurred after July 12, 2006 resulted in a Class A felony conviction. This change in the law explains why six of the incest convictions resulted in

sentences of ten years while the other two resulted in sentences of life.

**3.** It appears from the forensic examination report that a social worker came to the examination with B.H. and provided some of the information about her history because B.H. was reluctant to talk.

that B.H. said her father had caused. Dr. Calhoun did a vaginal examination and found tearing on B.H.'s hymen that was consistent with penetrating vaginal trauma, although he acknowledged that the injury could also be consistent with a sports injury or an accident. Dr. Calhoun said that he had no reason not to believe what B.H. told him, and his opinion was that the injury to her hymen was consistent with her having sex and with the history of rape she described. On redirect, Dr. Calhoun said that B.H. told him the only person who had had sex with her was her father, and that she had not had sex with her boyfriends.

All of this information was included in the forensic examination report, which was admitted into evidence without redaction. The report stated that the patient history was obtained from the Department of Community Based Services and B.H. herself. The report also included some information that Dr. Calhoun did not mention at trial. For example, the report said that B.H. told Dr. Calhoun that Appellant cut her with a knife and hit her with a baseball bat when she refused to have oral sex with him. She also said that Appellant had recently taken her to Louisville to meet a man he met online. She said Appellant made B.H. undress and go to the bedroom with the man, and the man "rubbed her private parts." According to the report, B.H. also told Dr. Calhoun that she told her teacher and wrote in her diary that her father had raped her. Dr. Calhoun's report reached the following conclusion: "Generally conclusive evidence of previous hymenal penetration with the tear in the 6:30 position. This coupled with the child[']s extreme emotional distress and

affect lead me to believe that the child has in fact been sexually abused."

Appellant raises two issues with Dr. Calhoun's testimony. First, he argues that Dr. Calhoun was allowed to testify about inadmissible hearsay. Second, he argues that Dr. Calhoun's statement that he believed B.H.'s story constituted impermissible bolstering of B.H.'s testimony. Appellant did not object at trial to Dr. Calhoun's testimony or the admittance of the forensic examination report,[4] so this Court reviews for palpable error. RCr 10.26. After discussing the two issues, this opinion then explains why they constituted palpable error in the context of this case.

### 1. Inadmissible Hearsay in Dr. Calhoun's Testimony and Forensic Examination Report

Dr. Calhoun's testimony and report contained a number of statements that B.H. made to him during the examination. The Commonwealth argues that this evidence was admissible under KRE 803(4), the hearsay exception for "[s]tatements made for purposes of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis."

Some of this hearsay was admissible under KRE 803(4) because it was reasonably pertinent to diagnosis or treatment. B.H.'s assertion that she had been vaginally raped repeatedly over eight years was admissible because it described the cause or external source of her injury. *Alford v. Commonwealth,* 338 S.W.3d 240, 247 (Ky.2011) (child victim's statements to a doctor "describing what was done to her

---

4. Defense counsel did object to the photographs that were attached to the report because he believed they were graphic and un-

necessary, and this objection was overruled. There was no objection to the contents of the report itself.

physically are admissible under KRE 803(4)"). Arguably, B.H.'s statement that she had been physically abused with a knife was also admissible because it described the source of some wounds identified during the examination.[5] But much of Dr. Calhoun's testimony and report was inadmissible hearsay. Specifically, the identification of Appellant as the perpetrator, the information about Appellant taking B.H. to Louisville to meet the unnamed man, and the assertion that B.H. told her teacher and wrote in her diary about the rapes were hearsay statements that were not pertinent to Dr. Calhoun's diagnosis and treatment of B.H.

Although this Court has long recognized that the identity of the perpetrator is seldom pertinent to diagnosis or treatment, *see Garrett v. Commonwealth*, 48 S.W.3d 6, 11–12 (Ky.2001), we recognized an exception to this general rule in *Edwards v. Commonwealth*, 833 S.W.2d 842 (Ky.1992). In *Edwards*, this Court held that the identity of a perpetrator of child sex abuse was pertinent to diagnosis or treatment when the perpetrator was a family or household member. *Id.* at 844. Under this interpretation of KRE 803(4), a doctor or other medical personnel could testify about the child victim's statement that a family member was the perpetrator. The rule in *Edwards* was reversed in the recent case *Colvard v. Commonwealth*, 309 S.W.3d 239, 243–47 (Ky.2010), which was handed down several weeks after the trial in the present case. In *Colvard*, this Court overruled *Edwards'* exception to KRE 803(4), holding that child sex abuse cases were subject to the same version of KRE 803(4) as other types of cases. *Id.* at 247. *Colvard* stated:

This opinion does not alter or limit the traditional hearsay exception allowing medical providers to testify to a patient's out-of-court statements as to what was done to the patient and how he or she was injured.... We simply state that we no longer recognize a special exception to the hearsay rule which allows medical providers to testify in court to the hearsay statements of a victim of sexual offenses which identify the alleged perpetrator because that identification is not pertinent to the medical treatment being provided.

*Id.*

■ Although *Colvard* was not the law at the time of Appellant's trial, Appellant can get the benefit of the new interpretation of KRE 803(4) because his case was still on direct appeal when it changed. *Whittle v. Commonwealth*, 352 S.W.3d 898, 905 (Ky.2011) (discussing retroactivity of new criminal rules); *Alford*, 338 S.W.3d at 247–8 (applying *Colvard* in a direct appeal although the trial took place several years before *Colvard* was decided). Here, Dr. Calhoun twice said that B.H. identified Appellant as the perpetrator, and the report repeatedly referred to B.H.'s father as the perpetrator. Under *Colvard*, this identification was inadmissible hearsay because it was not pertinent to medical diagnosis or treatment. This Court has recognized that it is highly prejudicial for a doctor or other professional to repeat the hearsay statement of a child identifying the child's abuser. *Colvard*, 309 S.W.3d at 247; *Alford*, 338 S.W.3d at 248.

■ The information about Appellant taking B.H. to Louisville for the purpose of allowing the unnamed man to sexually abuse her was also inadmissible hearsay

---

**5.** There may be other problems with this testimony under KRE 404(b) because Appellant was not charged with assaulting B.H. or trying to force her to have oral sex. This issue was not raised, however.

that was not pertinent to diagnosis or treatment. Again, the fact that B.H. said someone "rubbed her private parts" would be pertinent to treatment or diagnosis because it could be the cause of her injuries, but the facts surrounding that sexual contact, such as Appellant setting up the meeting and the identity of the perpetrator (here, the unnamed man) would not be pertinent. *Colvard,* 309 S.W.3d at 247. These hearsay statements are not admissible under KRE 803(4). These statements are also problematic because they describe an uncharged crime that does not appear to be inextricably intertwined with the charged crimes, KRE 404(b), and the Commonwealth did not give any notice of its intent to introduce such evidence under KRE 404(c).

■ Finally, the assertions that B.H. told her teacher about being raped and that she wrote in her diary about it were not pertinent to treatment or diagnosis. In *Alford,* this Court held that a child victim's "statements regarding whom she told, and why, are not pertinent to medical diagnosis and treatment," and thus are not admissible under KRE 803(4). *Alford,* 338 S.W.3d at 247. Although these statements may seem fairly innocuous, they served to bolster B.H.'s allegations because they show that she repeatedly said or wrote in late 2007 that Appellant raped her.

■ In this case, the prosecutor specifically asked Dr. Calhoun about what information he based his diagnosis on, and he responded that the entire history the patient told him was important to his diagnosis and recommendations for treatment. Dr. Calhoun asked open-ended questions of the patient to get as much information as possible. The Commonwealth argues that because Dr. Calhoun actually relied on all of the information provided by B.H., it is all pertinent to diagnosis and treatment and falls within the hearsay excep-

tion in KRE 803(4). It is true that a doctor treating a possible victim of child sex abuse has good reason to get as much information as possible about the child's situation, but this Court recognized in *Colvard* that this does not necessarily mean that all of the information gathered falls within the KRE 803(4) hearsay exception. *Colvard,* 309 S.W.3d at 246. It is important to keep in mind the underlying reason for this hearsay exception: "it is the patient's desire for treatment, not the doctor's duty to treat, that gives credibility to the patient's out-of-court statement." *Colvard,* 309 S.W.3d at 245. Generally, in a child sex abuse case, only those statements that relate to the patient's physical injuries and what caused them are pertinent to treatment and diagnosis under KRE 803(4).

■ The Commonwealth also argues that the hearsay statements were admissible under KRE 703 because they formed the basis of Dr. Calhoun's expert opinion. KRE 703(b) does allow evidence not otherwise admissible to come in "[i]f determined to be trustworthy, necessary to illuminate testimony, and unprivileged," to explain the basis of an expert's opinion. In this case, the trial court did not make the required findings that the statements were "trustworthy" or "necessary to illuminate testimony." *See Rabovsky v. Commonwealth,* 973 S.W.2d 6, 11 (Ky.1998) (finding that it was error to allow an expert to testify about inadmissible evidence that he used for the basis of his opinion "without addressing the factual determinations required by KRE 703(b)"). Moreover, there was no need for inquiry into the basis of Dr. Calhoun's opinion because he testified that he conducted a physical examination of B.H., which is clearly a sufficient basis for giving an expert opinion about her injuries. Thus, KRE 703 is not applicable to this case.

For these reasons, Dr. Calhoun should not have been allowed to recount B.H.'s statements about the identity of the perpetrator, the surrounding details of the trip to Louisville, and the fact that she told her teacher and wrote in her diary about the abuse. Dr. Calhoun's testimony at trial basically repeated the allegations that B.H. had made to him, and his forensic examination report, which was admitted in full, contained even more details about what B.H. and the social worker told him during the examination. In *Alford*, this Court considered a similar situation in which a doctor "not only named [the defendant] as the perpetrator, but went on to basically repeat the allegations to which [the child victim] had already testified, including statements that had no relevance to medical diagnosis and treatment." *Alford*, 338 S.W.3d at 248. This Court held that the testimony "was highly prejudicial and unfairly bolstered the credibility" of the victim, and it rose to the level of palpable error. *Id.* Dr. Calhoun's testimony about hearsay in this case had a similarly prejudicial effect.

### 2. Dr. Calhoun's Statements That He Believed B.H.

Appellant also argues that Dr. Calhoun said he believed what B.H. told him during the examination, and that this constituted impermissible bolstering of B.H.'s testimony. The prosecutor's last question to Dr. Calhoun was whether the injuries to B.H.'s hymen were normal for a child her age who had not had sexual intercourse. Dr. Calhoun explained that "this is where it always gets controversial" because there could be alternate explanations for the injuries other than sexual abuse. He continued:

> This is consistent with penetrating vaginal trauma of undetermined age, but also consistent with the history the child gave me. And I have no reason not to

believe this child. So the answer is: is it normal for a twelve-year-old child to have this? I don't believe so. Is it consistent with having sex? Yes, it is. Is there any other explanation? There might be. But is it consistent with the facts as laid out? Yes, it is. Is it within reasonable medical probability to say that the most likely answer is what has been laid before me? I believe that it is.

Some of Dr. Calhoun's testimony was clearly proper. His statements that B.H.'s injuries were consistent with her having sex and with the history she gave him are exactly the kind of information that an expert witness is meant to testify about. The average juror does not know what kind of injuries a child victim of sex abuse is likely to have, so expert testimony on this topic "assist[s] the trier of fact." KRE 702. In *Stringer v. Commonwealth*, 956 S.W.2d 883, 889 (Ky.1997), this Court considered very similar testimony that the child victim had suffered some injuries to the hymen and vagina that the testifying physician said were "compatible with [the victim's] history that she had given me." This Court held that this testimony "concerned a subject peculiarly within the knowledge of a trained physician and was likely to assist the jury in determining whether [the victim] had been sexually abused." *Id.* at 892. So these portions of Dr. Calhoun's statement were not erroneous.

However, Appellant argues that Dr. Calhoun's testimony was improper because, in addition to stating that her injuries were consistent with her history, he also said or implied that he believed B.H. was telling the truth. At first blush, Dr. Calhoun's testimony does not clearly profess a belief in the victim's history, but merely a statement that the doctor did not *disbelieve* her. And, in fact, in order to make a proper diagnosis, a doctor is required to

consider the facts as given in the history along with any physical evidence. But Dr. Calhoun's statement does include language that interjects the issue of "believing" B.H. And it includes a statement that he could say with some certainty—"reasonable medical probability"—that what B.H. said happened to her was the true cause of her injuries. This phrasing is improper.

■ It is well-settled that a witness cannot vouch for the truthfulness of another witness. *Stringer*, 956 S.W.2d at 888; *Bell v. Commonwealth*, 245 S.W.3d 738, 745 (Ky.2008), *overruled on other grounds by Harp v. Commonwealth*, 266 S.W.3d 813 (Ky.2008). In the context of child sex abuse cases, this Court has repeatedly held that no expert, including a medical doctor, can vouch for the truth of the victim's out-of-court statements. *See Hall v. Commonwealth*, 862 S.W.2d 321, 322–23 (Ky.1993) (collecting cases); *Bell*, 245 S.W.3d at 744–45. Indeed, this rule applies even when a witness *indirectly* vouches for the truth of the victim's statement. In *Bell*, this Court stated that it was error to allow a social worker to testify that a child sounded "spontaneous" and "unrehearsed" in describing sexual abuse. *Bell*, 245 S.W.3d at 744–45. Although the social worker in *Bell* did not literally say that she believed the child to be truthful, her opinion about the child's truthfulness was implicit in her statements, and so her testimony was impermissible bolstering. *Id.* at 745 n. 1.

This Court has held that social workers and psychologists are not qualified to testify that they believe a child has been sexually abused based on the child's demeanor. *Hall*, 862 S.W.2d at 322. However, a physician may in some situations be able to give an opinion that the child has been sexually abused *based on physical evidence of abuse*,[6] but not based solely on the child's demeanor. *See Hall*, 862 S.W.2d at 323.

Given that the physical evidence was inconclusive, Dr. Calhoun could not say, based on that evidence alone, that sexual assault had occurred. The most that he could legitimately say was that based on her history, *whether true or not*, when coupled with the physical findings which were consistent with sexual penetration, there was a reasonable probability that sexual assault had occurred. The distinction is that this language does not profess a belief in the truth of the victim's claims, but instead leaves that question to the jury. Obviously, if the jury does not find her testimony to be credible, then the diagnosis cannot be correct.

Here, the language used by the doctor, "And I have no reason not to believe this child," can create an inference that he *does* believe her, and thus by its certainty serves to bolster her testimony. It is not appropriate for medical experts to vouch for the truth of a victim's statement, but only to make a diagnosis under stated conditions, which does not require a per-

---

**6.** An example of a physician properly testifying that a child has been sexually abused appears in the unreported case *Blair v. Commonwealth*, No. 2002–SC–0834–MR, 2005 WL 387274 (Ky. Feb. 17, 2005). In that case, "a physical examination of [the victim] ... revealed that her hymen was worn in a manner inconsistent with a pre-pubescent eight-year-old child. The examining physician opined that [the victim] had experienced recurring digital or penile penetration." *Id.* at *2. The physician's testimony that the child had been

subjected to sexual abuse was based on the *physical* evidence. Here, Dr. Calhoun's opinion that B.H. had been sexually abused could not have been based solely on the physical evidence, because Dr. Calhoun testified that he could not say whether B.H.'s injuries were caused by rape or by some other cause, such as a sports injury. His statements that he believed she had been sexually abused were just another way of saying that he believed her, and they were therefore improper.

sonal judgment from the doctor as to whether he believes the patient, unless his belief is a necessary part of determining what treatment to use. Such is not the case here.

If Dr. Calhoun's testimony at trial stood alone, however, it might be more difficult to make a determination as to whether it amounted to palpable error. But it is coupled with language in the forensic examination report, which was admitted into evidence and thus available to the jury. The language in the report gives context to the doctor's testimony:

> Generally conclusive evidence of previous hymenal penetration with the tear in the 6:30 position. This coupled with the child[']s extreme emotional distress and affect lead me to believe that the child has in fact been sexually abused.

In this language, Dr. Calhoun states that he believes that the child has *in fact* been sexually abused. Since this could not be determined from the physical evidence alone, his opinion had to be based on belief in the victim's testimony for him to state the sexual abuse as fact rather than a probable diagnosis.

■ For these reasons, Dr. Calhoun's testimony was improper. An examining doctor in a child sex abuse case may testify that the child's injuries are consistent with sexual abuse, or consistent with the history given by the child. A doctor may also make a conditional statement that *if he accepts the child's statements as true,* the child's physical injuries and history would lead him to conclude that she has been sexually abused. But the doctor may not testify about the credibility of the child or state that he believes her. It should be

clear to the jury that the question of whether or not to believe the victim is one that the jury must answer, not the expert doctor or any other witness.

### 3. Palpable Error

■ Appellant did not object at trial to the errors in Dr. Calhoun's testimony, but this is one of those rare cases in which an unpreserved error rises to the level of "manifest injustice." RCr 10.26.

This case depended largely on B.H.'s credibility. Her in-court and out-of-court statements formed the bulk of the Commonwealth's case, and the other evidence provided only equivocal support for her allegations. There was some disputed evidence that Benedict had written a letter that implicated Appellant, but Benedict said that she had lied when she wrote it. Matthew and David Jr., Appellant's adult sons, testified that Appellant and B.H. would spend time alone together in a bedroom with the door closed, doing homeschooling work or watching television.[7] But both sons also denied seeing or hearing anything that suggested that Appellant was sexually abusing B.H., and they both said that it would be difficult to hide such activity because the trailer was so small. There was also the physical evidence introduced through Dr. Calhoun that B.H. had injuries consistent with penetrating vaginal trauma, but Dr. Calhoun could not say for sure whether the injuries were caused by rape or by a sports injury or accident, and there was no physical evidence (such as DNA) demonstrating that Appellant was the perpetrator. Thus, the only direct evidence of the rape was B.H.'s testimony.[8]

---

7. Matthew testified for the Commonwealth, and David Jr. testified for the defense.

8. To be clear, there is no question that B.H.'s testimony by itself would be sufficient to support a conviction. *Miller v. Commonwealth,*

283 S.W.3d 690, 697 (Ky.2009). The fact that her testimony was the primary evidence against Appellant is only significant here because it shows that her credibility was crucial to the Commonwealth's case, not because

Appellant recognized the importance of B.H.'s credibility to the outcome of the case and attacked her credibility through multiple witnesses. Appellant testified that B.H. could "spit out the lies pretty good," Appellant's sister testified that B.H. would lie to get something she wanted, and Appellant's son David Jr. said that B.H. had lied to him a few times. Appellant's mother said that B.H. stole something from a neighbor and then lied about it, and she said she believed B.H. was a very troubled child who fibbed a lot. David Jr.'s wife said that she did not believe Appellant raped B.H. because B.H. would have told her if he had. Several family members testified they did not believe that Appellant raped B.H.

As is clear from this summary, Appellant was able to introduce improper character evidence of specific instances of B.H.'s conduct to show her character for truthfulness. The witnesses for Appellant should have been limited to reputation or opinion testimony about B.H.'s character for truthfulness, and they should not have been allowed to testify about specific examples of B.H. lying or stealing. KRE 608. Also, they should not have been allowed to testify that they thought B.H. was lying about the rapes. *Lanham v. Commonwealth*, 171 S.W.3d 14, 23 (Ky.2005) ("[I]t is generally improper for a witness to characterize the testimony of another witness as 'lying' or otherwise.").

The Commonwealth directs the Court's attention to the attack on B.H.'s credibility because "[i]t was against this backdrop that Dr. Calhoun testified." However, that is not precisely correct, since the doctor testified *prior* to the improper testimony provided by defense witnesses. Under

KRE 608, once a witness's credibility has been attacked, evidence to support the witness's character for truthfulness may be introduced, but this evidence may only be presented in the form of reputation or opinion evidence.[9] Neither KRE 608 nor any other rule allows for rehabilitation of a witness's character by introducing inadmissible hearsay or testimony that vouches for the truthfulness of the witness's out-of-court statement.

The thrust of the Commonwealth's argument is that the Appellant was able to put a significant amount of evidence before the jury from several witnesses who stated they believed the victim was lying; consequently, it should be permissible for the doctor to say he believed she was telling the truth. As discussed above, this is not a situation in which Appellant opened the door to such testimony. Rather, this argument is relevant only to whether the error in the doctor's testimony rises to the level of palpable error. Was Dr. Calhoun's erroneous bolstering "balanced out" by the family members' improper testimony? Clearly, the jury did not believe the Appellant's family member witnesses. The question is whether the jury would have believed the victim based on her testimony alone or whether the bolstering by the doctor's testimony tipped the scales against the defendant to the extent that the trial was fundamentally unfair, thus rising to a manifest injustice.

Any jury is likely to give a weight to the doctor's testimony in this case that is greater than that of family members because of his disinterested position and his expert status. This Court has held that the testimony of a physician repeating a child victim's allegations against a defen-

there is any question about the sufficiency of the evidence.

9. Dr. Calhoun could not provide reputation or opinion evidence about B.H.'s truthfulness because the only time he met her was the examination.

dant is extremely prejudicial, as is a physician's testimony vouching for the truth of a child's out-of-court statement. *Alford,* 338 S.W.3d at 247; *Colvard,* 309 S.W.3d at 247; *Hall,* 862 S.W.2d at 323. This type of testimony by a respected professional gives extra weight to the child victim's testimony and serves to unfairly prejudice the defendant. *See Alford,* 338 S.W.3d at 251 (Cunningham, J., concurring) (discussing the prejudicial effect of a doctor repeating the statements of a child victim).

The Commonwealth could have sought, but did not, an admonition regarding the improper defense testimony. The fact that the Appellant introduced bad evidence does not mean that the Commonwealth gets a pass for doing so, nor does it make the harm from the doctor's bolstering of the victim any less effective.

As a whole, Dr. Calhoun's testimony rose to the level of palpable error. Dr. Calhoun was allowed to repeat at trial what B.H. had told him during the examination, including the identification of Appellant as the perpetrator. His forensic examination report repeated yet again all of the allegations against Appellant, went into more detail about the allegations, and described several uncharged bad acts. And Dr. Calhoun testified to the effect that he believed B.H.'s version of events. There can be little doubt that all of this improper testimony had the effect of making the jury more likely to believe B.H.'s testimony. Because the extensive use of inadmissible hearsay and the impermissible bolstering of B.H.'s testimony was highly prejudicial to Appellant and rose to the level of "manifest injustice," RCr 10.26, reversal is required.

**B. Other Issues**

The remaining issues are addressed only to the extent they are likely to arise again during a new trial. *See Bell v. Common-wealth,* 245 S.W.3d 738, 743 (Ky.2008) ("Because the judgment has been reversed for the foregoing reasons, we will address only those additional assignments of error that are likely to recur upon retrial."); *Terry v. Commonwealth,* 153 S.W.3d 794, 797 (Ky.2005); *Springer v. Common-wealth,* 998 S.W.2d 439, 445 (Ky.1999).

**1. Prior Consistent Statements**

■ Detective Roberts, who conducted the investigation of the case and interviewed B.H. soon after she was removed from the home, testified at trial immediately after B.H. The prosecutor asked Detective Roberts if B.H.'s testimony at trial was, as a whole, consistent with what she said during the initial interview in December 2007. Defense counsel objected, but the trial court overruled the objection, holding that the hearsay exception for prior consistent statements in KRE 801A(a)(2) applied. The prosecutor was allowed to ask the question again, and Detective Roberts responded that B.H.'s testimony at trial was consistent with what she said when he interviewed her more than two years before. He was not asked about specific statements that B.H. made during the interview. Although by itself this error may have been harmless, it is appropriate to address it to avoid error on retrial.

The Commonwealth argues that Detective Roberts's statement cannot be considered hearsay under KRE 801(c) because he did not testify about any specific statements that B.H. made. This argument fails because a statement need not be verbatim in order to be hearsay. In a similar case in which witnesses were allowed to testify that they did not perceive any inconsistencies in the victim's statements, this Court noted:

We perceive no conceptual distinction between testimony that repeats the

witness's prior consistent statement verbatim and testimony that the witness previously made statements that were consistent with her trial testimony. Either way, the evidence is offered to prove that the declarant's trial testimony is truthful because it is consistent with her prior statements. "A witness cannot be corroborated by proof that on previous occasions he has made the same statements as those made in his testimony."

*Dickerson v. Commonwealth,* 174 S.W.3d 451, 472 (Ky.2005) (quoting *Smith v. Commonwealth,* 920 S.W.2d 514, 517 (Ky. 1995)). Thus, the next question is whether B.H.'s statements during the interview can be admitted under a hearsay exception.

The Commonwealth argues that the trial court correctly determined that the statements were prior consistent statements admissible under KRE 801A(a)(2). This hearsay exception allows hearsay statements to be admitted "to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." KRE 801A(a)(2). The Commonwealth points out that Appellant attacked B.H.'s reputation for truthfulness throughout the trial. Specifically, Appellant asserted that B.H. made the allegations against Appellant in order to get away from Appellant's home and to get out of going to school.

KRE 801A(a)(2) does not apply in this case because Appellant did not charge a *recent* fabrication or improper motive. The hearsay exception in KRE 801A(a)(2) is only available if the prior consistent statement was made "before the alleged motive to fabricate came into existence." *Slaven v. Commonwealth,* 962 S.W.2d 845, 858 (Ky.1997). Here, B.H.'s alleged motive to lie in order to get away from Appellant's home and to get out of going to school remained the same from when she first spoke to Detective Roberts through

the time of trial. Therefore, KRE 801A(a)(2) does not apply, and it was error to allow Detective Roberts to testify that B.H.'s testimony at trial was consistent with her previous statements. *See Smith v. Commonwealth,* 920 S.W.2d 514, 517 (Ky.1995) (holding that it was reversible error to allow a detective to testify about what a child victim told him when the victim's motive "remained the same from the start of the investigation through the trial"). At retrial, Detective Roberts should not be allowed to testify about this information under KRE 801A(a)(2).

### 2. *"Other Bad Acts" Evidence*

 Appellant argues that he was prejudiced by the admission of evidence of uncharged crimes or bad acts. He claims that this evidence created palpable error because the Commonwealth did not give notice of its intent to introduce the evidence under KRE 404(c) and because the evidence could not be admitted under KRE 404(b). Because the case is reversed on other grounds, it is not necessary to decide whether the errors rose to the level of palpable error, but it is appropriate to address the admissibility of the evidence to avoid error on retrial.

Appellant points to two instances of bad acts that should not have been admitted under KRE 404. During the redirect examination of Benedict, the prosecutor asked if Appellant was manipulative and emotionally and physically abusive. She agreed that he was, although she said it was caused by her addiction to prescription drugs. The prosecutor also asked if Benedict had ever sought protective orders against Appellant. She testified that she had obtained protective orders against Appellant for herself and her children more than once, and that Angela Green had also obtained one.

Appellant also objects to the part of Dr. Calhoun's forensic examination report that

discussed B.H.'s allegation that Appellant took her to Louisville to allow another man who he met over the Internet to sexually abuse B.H.

Appellant claims that the evidence about the protective orders and the trip to Louisville should not have been admitted under KRE 404. Under KRE 404(c), the Commonwealth is required to give "reasonable pretrial notice to the defendant of its intention" to offer evidence of other crimes, wrongs, or acts. The Commonwealth did not provide any pretrial notice of this evidence, and so Appellant is correct that the Commonwealth violated KRE 404(c). On retrial, the Commonwealth must provide the notice required in KRE 404(c) if it intends to introduce this evidence. *See Gray v. Commonwealth,* 843 S.W.2d 895, 897 (Ky.1992) (holding that even if the evidence of uncharged crimes or bad acts is admissible under KRE 404(b), fundamental fairness requires reasonable notice of the Commonwealth's intent to introduce the evidence).

The Commonwealth may not offer evidence of other crimes or bad acts for the purpose of proving the defendant's character or propensity for criminal activity. However, the Commonwealth may introduce such evidence for another purpose, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," or if the uncharged bad act is "inextricably intertwined" with the evidence of the charged crimes. KRE 404(b). If the Commonwealth intends to introduce the evidence of the protective orders and the trip to Louisville on retrial, it must demonstrate that the evidence fits under one of the exceptions listed in KRE 404(b). *Anderson v. Commonwealth,* 231 S.W.3d 117, 120 (Ky.2007) ("[T]he burden lies with the prosecution to provide an alternate base for admission of the evidence apart from its propensity relevance."). The Commonwealth may well be able to demonstrate that the evidence is admissible because it is being offered for a proper reason,[10] but it bears the burden of making that showing.

It was error to admit this evidence without the proper notice under KRE 404(c) or the proper showing of relevance under KRE 404(b). On retrial, this potentially prejudicial evidence must be carefully considered before it is admitted. *Bell v. Commonwealth,* 875 S.W.2d 882, 889 (Ky.1994) ("[T]rial courts must apply the rule [KRE 404(b)] cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime.").

### III. CONCLUSION

For the foregoing reasons, Appellant's convictions are reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

All sitting. MINTON, C.J.; CUNNINGHAM, SCHRODER, SCOTT and VENTERS, JJ., concur.

ABRAMSON, J., concurs in result only.

---

10. For example, the Commonwealth argues in its brief that the information about the protective orders is admissible because it explains Benedict's motive for giving inconsistent testimony. The Commonwealth's theory is that Benedict was frightened of Appellant because of his history of domestic violence, which explains why she changed her testimony. If the Commonwealth gives notice of its intent to introduce the evidence under KRE 404(c), and it can show that the evidence is being offered to show Benedict's motive for changing her testimony (rather than just Appellant's propensity for abusive behavior), it may be appropriate for the trial court to allow the evidence under KRE 404(b).