William R. KING, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2013–SC–000556–MR

Supreme Court of Kentucky.

RENDERED: OCTOBER 29, 2015

COUNSEL FOR APPELLANT: Michael Romano Mazzoli, Cox & Mazzoli, PLLC

COUNSEL FOR APPELLEE: Jack Conway, Attorney General of Kentucky, Bryan Darwin Morrow, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General

## OPINION OF THE COURT BY JUSTICE VENTERS

Appellant, William R. King, appeals from a judgment of the Laurel Circuit Court convicting him of first-degree sodomy and first-degree sexual abuse. For these convictions, Appellant was sentenced to a total of twenty years' imprisonment. Appellant now appeals as a matter of right alleging that: 1) testimony of one of the Commonwealth's witnesses improperly bolstered the alleged victim's credibility resulting in palpable error and manifest injustice; and 2) the trial court erred in denying his motion for a directed verdict on the sodomy charge.

For the reasons that follow, we agree with the Commonwealth that the trial court correctly ruled that Appellant was

not entitled to a directed verdict on the sodomy charge. However, we conclude that palpable error occurred when the Commonwealth's investigating officer testified that a local task force on child sexual abuse, comprised of local officials and prominent citizens, recommended Appellant's indictment, resulting in manifest injustice under RCr 10.26. Consequently, we reverse the judgment and remand the case for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Eleven-year old Thomas [1] and his family attended the church where Appellant, William R. King, then aged twenty-six years, served as a youth minister. In early 2012, Thomas participated in a sleepover with other children at Appellant's house. A few days later, Thomas told his mother that during the sleepover Appellant had subjected him to sexual acts. This information was reported to the appropriate authorities, resulting in Appellant being charged with first-degree sodomy and first-degree sexual abuse. At trial, Thomas testified that Appellant "touch[ed] my butt ... with his tongue," the allegation which served as the basis for the sexual abuse charge. Thomas also testified that later the same evening he was awakened because "[Appellant] had his mouth on my [penis]," the allegation which served as the basis for the sodomy charge. Appellant was convicted at trial, based in large part upon Thomas's testimony.

## II. ANALYSIS

### A. Appellant's Motion for Directed Verdict

■ Appellant first contends that the trial court erred by denying his motion for a directed verdict on the sodomy charge. After the Commonwealth presented all of its evidence, Appellant's counsel moved for a directed verdict on the sodomy charge. In support of his motion, Appellant argued that the evidence that Appellant's mouth came in contact with Thomas's anus did not satisfy the elements of sodomy. The trial court then clarified that the sodomy count was predicated upon the allegation of Appellant's oral contact with Thomas's penis rather than the act of oral-anal contact. Appellant offered no other grounds in support of his motion. The trial court denied the motion for a directed verdict, holding that if believed by the jury, Thomas's allegation that Appellant made penile-oral contact with him satisfied the elements of first-degree sodomy.

■ The standard for reviewing a motion for directed verdict is well established:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). On appellate review, the reviewing court may only direct a verdict "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt." *Id.; see also Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky.1983).

KRS 510.070 provides that:

(1) A person is guilty of sodomy in the first degree when:

  (a) He engages in deviate sexual intercourse with another person by forcible compulsion; or

1. Thomas is a pseudonym employed by the court to protect the privacy of the child.

(b) He engages in deviate sexual intercourse with another person who is incapable of consent because he:

1. Is physically helpless; or
2. Is less than twelve (12) years old.

As set forth in KRS 510.010(1), " '[d]eviate sexual intercourse' means any act of sexual gratification involving the sex organs of one person and the mouth or anus of another[.]" Thomas's trial testimony established all the necessary elements: there was evidence of an act of sexual gratification involving Appellant's mouth and Thomas's sex organ (penis). As such, the Commonwealth presented evidence that Appellant engaged in deviate sexual intercourse with Thomas. There was also evidence that Thomas was less than twelve years old at the time of the incident. The Commonwealth's evidence therefore was sufficient to establish that Appellant violated KRS 510.070(1)(b)(2).

■ Appellant further asserts that in this case, where Thomas's credibility is the central issue, inconsistencies and improbable aspects of his testimony were so great as to destroy its credibility, rendering it inadequate to sustain the verdict. We disagree. The testimony of a single witness is enough to support a conviction. *See Gerlaugh v. Commonwealth,* 156 S.W.3d 747, 758 (Ky.2005) (citing *La Vigne v. Commonwealth,* 353 S.W.2d 376, 378–79 (Ky.1962)). Our courts have long held that a jury is free to believe the testimony of one witness over the testimony of others. *See Adams v. Commonwealth,* 560 S.W.2d 825, 827 (Ky.App.1977). In ruling on Appellant's motion, the trial court was required to construe conflicting evidence in the light most favorable to the Commonwealth. *Benham,* 816 S.W.2d at 187.

■ Specifically, for example, Appellant argues that Thomas testified that he was lying on his stomach when Appellant put his mouth on Thomas's penis, something that Appellant contends is a physical impossibility. Whatever the flaws or inconsistencies that could be drawn from Thomas's testimony, we do not find it so fantastic as to render the testimony unworthy of belief. Thomas's testimony had only the kinds of routine inconsistencies and flaws common to child witnesses, all of which go to the weight to be accorded his testimony. The jury was capable of fairly weighing any conflicting or inconsistent aspects of the testimony, and rendering its verdict accordingly. Matters of a witness's credibility and of the weight to be given to a witness's testimony are solely within the province of the jury. Appellate courts may not substitute their own judgment of the facts for that of the jury. *Brewer v. Commonwealth,* 206 S.W.3d 313, 319 (Ky.2006) (citing *Commonwealth v. Jones,* 880 S.W.2d 544, 545 (Ky.1994)). "Determining the proper weight to assign to conflicting evidence is a matter for the trier of fact and not an appellate court." *Washington v. Commonwealth,* 231 S.W.3d 762, 765 (Ky.App.2007) (overruled on other grounds by *King v. Commonwealth,* 302 S.W.3d 649 (Ky.2010)) (citing *Bierman v. Klapheke,* 967 S.W.2d 16, 19 (Ky.1998)).

We therefore conclude that the trial court did not err in denying Appellant's motion for a directed verdict.

**B. The Introduction of Improper Testimony from Detective Anderkin Was Palpable Error.**

Appellant contends that palpable error occurred when Thomas's credibility was improperly bolstered by Detective Anderkin's testimony relating to the discredited theory of child sexual abuse accommodation syndrome [CSAAS][2] and by Ander-

---

**2.** In *Newkirk v. Commonwealth,* 937 S.W.2d 690 (Ky.1996), we noted that "[i]n an unbro-

kin's testimony about the role of the Laurel County Task Force on Child Sexual and Physical Abuse in the pre-indictment process. Because this portion of Anderkin's testimony was clearly improper and resulted in manifest injustice, we agree with Appellant and find that reversible palpable error occurred.

Detective Anderkin was the Commonwealth's chief investigator in this case. She testified that Thomas's five-day delay in reporting the incident to his mother was not unusual because in her experience with more than 1,500 cases, it was "very rare" for children to immediately report sexual abuse. She added, "They seldom [report sex abuse immediately]; sometimes it is years after the event." Anderkin cited to no scientific studies or other data to confirm her claim that delayed reporting is indicative of a credible claim of sexual abuse.[3] As the Commonwealth readily concedes, Appellant never claimed that Thomas's delayed report to his mother was indicative of a false report. Therefore, it cannot be claimed that Anderkin's statement was admissible to refute an attack on Thomas's credibility based on the delay in his report.

Anderkin also testified about the procedure used in Laurel County for assessing whether to bring charges against a suspect in a child sexual abuse case, and she noted that this procedure was used in making the decision to prosecute Appellant. As she explained, accusations of sex abuse upon children are reviewed by the Laurel County Task Force on Child Sexual and Physical Abuse (the Task Force), a committee comprised of local law enforcement officers, the Commonwealth's Attorney, the County Attorney, social workers, and school counselors, all of whom are experienced in the area of child sexual abuse. The Task Force reviews the evidence and if it determines that the case is meritorious, it may recommend that the prosecutor proceed with indictment and prosecution. Anderkin's testimony thereby implies to the jury that, in addition to the ordinary grand jury review, a prestigious body of experienced law enforcement and child welfare experts reviewed the evidence against Appellant and decided that he should be prosecuted.

Since at trial Appellant objected to neither of these claims of improper evidence, he now argues that individually or in combination they rise to the level of palpable error. RCr 10.26 provides:

A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

Blount v. Commonwealth, 392 S.W.3d 393, 396 (Ky.2013).

ken line of decisions ... this Court has repeatedly expressed its distrust of expert testimony which purported to determine criminal conduct based on a perceived psychological syndrome." Id. at 690–91. The multiple rationales for the specific rule against CSAAS testimony include "the lack of diagnostic reliability, the lack of general acceptance within the discipline from which such testimony emanates, and the overwhelmingly persuasive nature of such testimony effectively dominating the decision-making process, uniquely the function of the jury." Id. at 691. See also

3. The significance of Anderkin's accounting of delayed reports is easily overrated, and subject to misunderstanding, because her statistic, "over 1500 cases," seems not to distinguish between delay in reports of sex abuse that actually happened, and delay in reports of false charges of sex abuse. If false reports of sex abuse have about the same rate of delayed reporting as honest reports, then Anderkin's statement has no probative value, and significant potential for prejudice.

### 1. *Anderkin's testimony of the victim's delayed reporting of abuse*

The Commonwealth concedes that the "delayed reporting" aspect of Anderkin's testimony was improper. We held in *Miller v. Commonwealth,* 77 S.W.3d 566 (Ky.2002), that testimony nearly identical to Anderkin's was improper.[4] In *Hellstrom v. Commonwealth,* 825 S.W.2d 612 (Ky.1992) we reversed a conviction based upon testimony that "'delayed disclosure' is common in these types of cases." We noted that "[b]oth sides recognize that we have reversed a number of cases because of trial error in permitting the use of testimony regarding the so-called 'child abuse accommodation syndrome' to bolster the prosecution's case." *Id.* at 613 (citations omitted).

The phenomenon of "delayed reporting" is but one of several (usually stated as five) symptoms claimed to be characteristic of the so-called "child sexual abuse accommodation syndrome" (CSAAS), a theoretical construct promoted by some social and psychological professionals as a useful tool for diagnosing young victims of sexual abuse and for verifying claims of sexual abuse. That Detective Anderkin did not use the term "child abuse accommodation syndrome" and did not relate all of its symptoms to Thomas is inconsequential; omission of the term "syndrome" does not transform the objectionable nature of the testimony into reliable scientific evidence. *Blount v. Commonwealth,* 392 S.W.3d 393, 395 (Ky.2013).

Notably, in the foregoing cases the error was properly preserved for ordinary appellate review, and so a showing of manifest injustice was not required. Here, the error was not preserved by a contemporaneous objection and so our review is for palpable error pursuant to RCr 10.26. "Authorities discussing palpable error consider it to be composed of two elements: obviousness and seriousness." *Ernst v. Commonwealth,* 160 S.W.3d 744, 759 (Ky. 2005). Given the substantial body of case law against the use of "delayed reporting" to validate a claim of sexual abuse,[5] we have to conclude that the inadmissibility of Anderkin's statement was obvious. However, with respect to the second element, we are satisfied from our review of the record that, while serious and prejudicial, the evidence was not so damaging to Appellant's case that it resulted in manifest injustice. This aspect of Anderkin's testimony was not palpable error.

At this point, it is worth taking note of the history of CSAAS evidence in Kentucky. Justice Abramson's separate opinion echoes the lament of Justice Graves's dissenting opinion nearly twenty years ago in *Newkirk v. Commonwealth,* 937 S.W.2d 690 (Ky.1996): "Kentucky remains as one of the few jurisdictions that still rejects all testimony regarding the phenomenon clinically identified and demonstrated as the Child Sexual Abuse Accommodation Syndrome which provides jurors a psychological explanation for certain behavior in small children following sexual abuse." *Id.* at 696. Whether that is a good thing or a bad thing is yet to be shown. Kentucky is also the only state to eliminate commercial bail bonding and the first state to institute video recording in all of its courtrooms. Being exceptional is *per se* neither good nor bad. What is clear is that the validity of the CSAAS theory is not readily self-

---

4. In *Miller,* a police investigator testified that of the 900 to 1000 cases of child sex abuse she had investigated, 90% involved delayed reporting of the alleged abuse. *Id.* at 571.

5. This use is distinguished from instances in which a defendant may open the door to such evidence by insinuating that the delayed reporting indicates that the claim of sexual abuse has been fabricated. Here, Appellant did not open that door.

evident. The theory is not self-proving and an appellate court cannot spontaneously decide that, from now on, CSAAS evidence should be admissible. Like any scientific or technical theory, the validity of CSAAS as a diagnostic tool for verifying claims of sexual abuse is a matter based upon facts. Facts are determined from evidence presented to a trial court, ordinarily at a pre-trial hearing by adverse parties. As far as we can tell, *no trial court in Kentucky has ever been asked to hold such a hearing with respect to CSAAS.*

Having reviewed *every* reported decision of a Kentucky court on the subject of CSAAS admissibility, we are unable to find any conscientious effort by any party to establish the validity of the CSAAS theory under either the *"Frye* test" [6] (whether the evidence had gained general acceptance in the relevant scientific community) which was prevalent prior to 1993; or under the less restrictive *"Daubert* test" [7] which we adopted in 1995. *See Mitchell v. Commonwealth,* 908 S.W.2d 100,102 (Ky.1995) ("[P]ursuant to KRE 702 and *Daubert,* expert scientific testimony must be proffered to a trial court. The trial court judge must conduct a preliminary hearing on the matter utilizing the standards set forth in *Daubert.").* The standards include: "(1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific, technical, or other specialized community." *Goodyear Tire and Rubber Co.*

*v. Thompson,* 11 S.W.3d 575, 578–79 (Ky. 2000).

The first appellate decision in Kentucky to address the subject of CSAAS evidence is *Bussey v. Commonwealth,* 697 S.W.2d 139 (Ky.1985). In *Bussey,* we noted "the record does not reveal any attempt made by the prosecution to establish the credibility of the child sexual abuse accommodation syndrome as a concept generally accepted in the medical community." *Id.* at 141. The following year, we noted in *Lantrip v. Commonwealth,* "There was no evidence that the so-called 'sexual abuse accommodation syndrome' has attained a scientific acceptance or credibility among clinical psychologists or psychiatrists." 713 S.W.2d 816, 817 (Ky.1986).

In the next case, *Hester v. Commonwealth,* 734 S.W.2d 457, 458 (Ky. 1987), we held that the need to prove the scientific validity of the CSAAS theory could not be evaded simply by avoiding the use of the term "child sexual abuse accommodation syndrome." The Commonwealth's failure to offer adequate evidence to prove the validity of the theory was again noted in *Mitchell v. Commonwealth,* 777 S.W.2d 930 (Ky.1989):

[A social worker] testified that this sexual abuse accommodation syndrome was generally accepted by "clinicians" without specifying what clinicians she referred to, but there was no medical testimony of any nature whatsoever that this syndrome has become a generally accepted medical concept.

. . . .

There was no testimony that all children who are sexually abused exhibit these symptoms, nor was there testimony that children who have not been sexually abused do not sometimes exhibit some of

---

6. *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923).

7. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

the elements of the syndrome. There was no testimony that sexual abuse by other persons than the accused could not have produced the same symptoms in the victims.

*Id.* at 932. *See also Brown v. Commonwealth*, 812 S.W.2d 502, 504 (Ky.1991)[8] ("This Court held in *Bussey* ... that the trial court erred in allowing evidence of the Syndrome into evidence because it was not established as a 'generally accepted medical concept.' In the cases following *Bussey*, this court has consistently held that the admission of evidence of the Syndrome or symptoms thereof is reversible error.")

In *Dyer v. Commonwealth*, 816 S.W.2d 647, 653 (Ky.1991),[9] we noted again that "[w]e reversed all of these cases [*Bussey, Lantrip, Hester,* and *Mitchell*] because the evidence was insufficient to admit the evidence under the '*Frye*' test: There was *no evidence* that the so-called 'sexual abuse accommodation syndrome' has attained a scientific acceptance or credibility among clinical psychologists or psychiatrists.'" *Id.* (quoting *Lantrip*, 713 S.W.2d at 817) (emphasis added).

A review of all of the post-*Daubert* decisions relating to CSAAS reveals the same thing: many times the Commonwealth has attempted to prove its case using CSAAS evidence at trial, but not once has the Commonwealth attempted to prove at a *Daubert* hearing the scientific reliability and validity of the CSAAS theory. Not once. In *Bussey*, the very first case in which this issue arose, we highlighted the need to properly establish the validity of the theory. In the thirty years since *Bussey*, our ruling on the issue has not changed because the evidentiary record

has not changed: "the record [*still*] does not reveal any attempt made by the prosecution to establish the credibility of the child sexual abuse accommodation syndrome." *Bussey* at 141.

The validity of the theory was not self-evident in 1985 and it is not self-evident today. However, the gravity of the issue is self-evident. Given the serious personal and social consequences at stake, it would seem likely that over the past three decades the theory would have been exposed to thorough and rigorous research to enable its proponents to demonstrate the validity of the theory. To be clear: we have *never* ruled the theory to be inadmissible because it is demonstrably wrong; rather, we have ruled it inadmissible because no one has offered proof of its validity. That ruling is not likely to change unless proponents of the theory provide proof of the relevant factors weighing on the theory's credibility.

### 2. Anderkin's testimony that the "Task Force on Child Sexual and Physical Abuse" recommended that Appellant be prosecuted

■ Appellant also complains on appeal that his trial was tainted by Detective Anderkin's testimony that prominent local officials serving on the child sex abuse task force recommended Appellant's prosecution. Anderkin testified that after she was informed by social workers of Thomas's claims, and after then speaking to Thomas's parents:

> I presented the matter to the members of the Laurel County MultiDisciplinary Task Force on Child Sexual and Physical Abuse ... this Task Force is mandated by Kentucky law[10]

8. Overruled on other grounds by *Stringer v. Commonwealth*, 956 S.W.2d 883 (Ky.1997).

9. Overruled on other grounds by *Baker v. Commonwealth*, 973 S.W.2d 54 (Ky. 1998).

10. Presumably Detective Anderkin is referring to KRS 431.650–670. While the statutory purpose underlying these statutes is to enhance the investigation and prosecution of child sexual abuse cases, there is no language

and it's composed of members from the Commonwealth Attorney's office, the County Attorney's office, victim's advocates, social services, school guidance counselors, police officers ... and we meet once a month and we discuss our cases ... we look at each case on its individual basis, and based upon the decision made by the Task Force it is recommended whether, you know, you go forward with the prosecution or to the grand jury, or not.

The prosecutor then asked Anderkin, "In this case, obviously, an indictment was returned?" And she testified: *"Yes, [indictment] was recommended by the Task Force."*

In purpose and effect, Anderkin's testimony states directly to the jury that a committee of esteemed local officials and respected sex abuse experts, after carefully screening the evidence "on an individual basis," substantiated Thomas's claims by recommending that Appellant be charged and prosecuted. The clear implication is that such an august body would not have recommended Appellant's prosecution if they did not believe Thomas's testimony. Thus, by testifying that the Task Force approved the charges, the Commonwealth was permitted to vouch for Thomas's credibility as having been verified by a panel of respected experts.

It is well established that an opinion vouching for the truthfulness of another witness is improper. *Stringer v. Commonwealth,* 956 S.W.2d 883, 888 (Ky.1997) (citing *Hall v. Commonwealth,* 862 S.W.2d 321, 323 (Ky.1993). For example, physicians may give an opinion concerning their patients' medical diagnosis, but they may

not give an opinion as to the truthfulness of their patient. *Hall,* 862 S.W.2d at 323.

We liken this case to the improper bolstering that occurred in *Hoff v. Commonwealth,* 394 S.W.3d 368 (Ky.2011). In *Hoff,* a physician who treated the child victim of an alleged rape testified that he "had no reason not to believe" what the victim told him, reasoning that the child's explanation of the events was "within [a] reasonable medical probability" of being an actual account of what had happened. *Id.* at 375. Upon review, we determined that while the physician's testimony regarding his medical diagnosis was proper, his statement that he did not disbelieve the victim's story was improper bolstering culminating in palpable error. *Id.*

By the same line of reasoning, the testimony that the Task Force had "recommended" prosecution is the same thing as saying that it was the opinion of the members of the Task Force that Thomas's charges were true. The information thus relayed to the jury impermissibly bolstered the victim's testimony with the opinion of Task Force members. In a sense, the issue is even more egregious than in *Hall* and *Hoff* because in those cases, the improper bolstering was the opinion of a witness who was present for cross-examination; here, the victim's testimony was bolstered by the opinion of the Task Force members who were not even present.

We also note that whether the Task Force believed Thomas's story was obviously irrelevant to the case. The most elementary rule of evidence is that irrelevant information is not admissible. KRE 402.[11] The Task Force's recommendation

in the law making the pre-indictment screening of such charges to be an element of the prosecution that must be proven at trial.

**11.** KRE 401 defines relevant evidence as "evidence having any tendency to make the exis-

tence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

tended neither to prove nor disprove that the sexual assault actually occurred, but its prejudicial nature is clearly apparent. The only purpose served by the introduction of the Task Force testimony was to improperly influence the jury's perception of Thomas's account by suggesting that knowledgeable and reputable members had already accepted his testimony as truthful. Thus even assuming that there was some relevance to the evidence, that probative value of the testimony was substantially outweighed by its prejudicial effect. KRE 403.

### 3. The testimony challenged on appeal resulted in manifest injustice

The second element identified in *Ernst* for finding palpable error, the seriousness of the error, is present when "a failure to notice and correct such an error would 'seriously affect the fairness, integrity, and public reputation of the judicial proceeding.'" *Id.* at 758, quoting ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK, § 1.10[8][b] (4th ed. LexisNexis 2003) and 1 McLaughlin, *Weinstein's Federal Evidence*, § 103.42[3] (2d ed.2003)). The "seriousness" aspect of a palpable error determination is captured by the requirement of RCr 10.26, which allows for relief from unpreserved error only when it results in "manifest injustice." The proponent of palpable error must show the "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky.2006). "To discover manifest injustice, a reviewing court must plumb the depths of the proceeding . . . to determine whether the defect in the proceeding was shocking or jurisprudentially intolerable." *Id.* at 4. In other words, when reviewing for manifest injustice, the court must discern whether there is a substantial possibility that, but for the error, the verdict would have been different or

whether the error resulted in a fundamentally unfair trial. Otherwise, the unpreserved error will be held non-prejudicial. *Schoenbächler v. Commonwealth*, 95 S.W.3d 830, 836 (Ky.2003).

Upon review, we conclude that the prejudicial impact of the Task Force testimony resulted in manifest injustice. In *Hoff*, 394 S.W.3d 368 (Ky.2011), we determined that a single expert witness's improper opinion that the victim was telling the truth compelled a reversal under our manifest injustice standard. Here, a case in which the verdict was totally dependent upon the credibility of the accuser, the jury was erroneously informed that the esteemed local professionals on the Task Force placed their stamp of approval on Thomas's testimony by recommending that Appellant be indicted.

The scales were tilted even further against Appellant by the improper introduction of the delayed-reporting evidence. The gravity of these obvious errors is such that we are persuaded that there exists a substantial possibility that the result of the trial would have been different, but for their introduction.

These errors, compounded in a case based almost entirely upon the veracity of a single witness, resulted in a judgment that is jurisprudentially intolerable. As such, we are constrained to reverse Appellant's convictions for first-degree sodomy and first-degree sexual abuse and remand the proceeding for a new trial.

### III. CONCLUSION

For the aforementioned reasons, we reverse and remand this matter to the Laurel Circuit Court for a new trial.

Minton, C.J., Cunningham and Noble, JJ., concur. Abramson, J., dissents by separate opinion, in which Barber and Keller, JJ., join.

**ABRAMSON, J., DISSENTING:**

For the reasons stated herein, I respectfully and strongly dissent. While Detective Anderkin's testimony concerning the Child Abuse Task Force was arguably improper, the error was not palpable. In addition, the time has come for this Court to reconsider its rigid stance on the admissibility of Child Sexual Abuse Accommodation Syndrome (CSAAS) testimony and to align itself with the overwhelming majority of our sister jurisdictions, which allow such testimony under circumstances explained more fully *infra.*

## I. Kentucky's Outdated Position On CSAAS Evidence is Ripe For Reconsideration.

On direct examination, Detective Anderkin explained that she had been notified of Thomas's case on June 4, 2012, just four days after he had spent the night at King's house. She testified that in her experience, "immediate" reporting of child sexual abuse is "very rare," with some children delaying reporting for years. This statement forms the basis of what the majority lambasts as erroneous CSAAS evidence (despite conceding that the statement was not palpable).[12]

The majority accurately recounts this Court's prohibition against CSAAS evidence. Child sexual abuse "accommodation" as a syndrome was first introduced in 1983. *See* Roland Summit, *The Child Sexual Abuse Accommodation Syndrome,* 7 Child Abuse & Neglect 177 (1983). This Court's first opportunity to address the use of CSAAS evidence in a criminal case arose two years later in *Bussey v. Commonwealth,* 697 S.W.2d 139 (Ky.1985). The defendant in *Bussey* was accused of sexually abusing his daughter. *Id.* at 141. Over the defendant's objection, the trial court admitted the testimony of a psychiatrist who testified that it was his expert opinion that the victim exhibited symptoms associated with the "relatively new" theory of CSAAS. *Id.* at 140. Finding error, the Court agreed with the defendant on appeal that "the prosecution did not establish that the syndrome is a generally accepted medical concept." *Id.* The Court noted that the Commonwealth made no attempt "to establish the credibility of the child sexual abuse accommodation syndrome as a concept generally accepted in the medical community." *Id.*

The Court's position in *Bussey* was soon reaffirmed in *Lantrip v. Commonwealth,* 713 S.W.2d 816 (Ky.1986). The rule announced in these cases—that CSAAS lacked any established scientific credibility rendering it admissible—formed the basis

---

**12.** While the majority calls Detective Anderkin's testimony "substantially identical" to the testimony of a witness in *Miller,* 77 S.W.3d at 566, I disagree. The *Miller* expert's testimony—that there was a delay in reporting sexual abuse in 90% of the expert's cases—differs from Detective Anderkin's testimony in that the victim in *Miller,* who was abused for several years waited until four weeks after the last incident to report. Here, Thomas only waited four days. This is significant in that the four-day period between the one incident in this case and the disclosure arguably does not fit the CSAAS criteria. In short, while it is "very rare" for children to disclose sexual abuse immediately, Thomas did so within four days, a very brief period in this type of case.

When viewed in the context of the entire direct examination, Detective Anderkin's statements that Thomas reported the incident within four days of the attack cast his behavior as inconsistent in her experience where children "seldom" report immediately. The defense strategy throughout the trial was that Thomas made false allegations against King so that his parents could prevail in a civil suit against the Kings and their church. A possible explanation as to why the prosecutor would elicit this testimony from Detective Anderkin on direct examination was to undercut any attempt by the defense to paint Thomas's relatively prompt reporting as evidence of a false allegation.

of a deluge of reversals in the late 1980's and early 1990's. *See Hester v. Commonwealth,* 734 S.W.2d 457 (Ky.1987); *Mitchell v. Commonwealth,* 777 S.W.2d 930 (Ky. 1989); *Brown v. Commonwealth,* 812 S.W.2d 502 (Ky.1991); *Dyer v. Commonwealth,* 816 S.W.2d 647 (Ky.1991); *Hellstrom v. Commonwealth,* 825 S.W.2d 612 (Ky.1992) (also finding that the testimony of an expert constituted hearsay). In 1996, the *Newkirk v. Commonwealth* decision expanded the basis for Kentucky's prohibition of CSAAS evidence, declaring that such testimony constituted impermissible credibility-vouching. 937 S.W.2d 690 (Ky.1996). The 2002, *Miller v. Commonwealth* opinion offered yet another nuance to the preclusion, concluding that CSAAS testimony amounts to little more than inadmissible propensity evidence. 77 S.W.3d 566 (Ky.2002); *see also Kurtz v. Commonwealth,* 172 S.W.3d 409 (Ky.2005). The more recent *Sanderson v. Commonwealth* decision rejected the theory for the same reasons articulated in the previously mentioned line of CSAAS cases. 291 S.W.3d 610 (Ky.2009).

Over the past three decades, Kentucky has resisted the imagined invasion of CSAAS evidence on all conceivable fronts, and, remarkably, has recognized no exceptions to this general rule of exclusion. This Court has, in essence, set forth a bright-line prohibition against *any* form of CSAAS evidence, regardless of substance or style. *See Hellstrom,* 825 S.W.2d at 614 (avoiding the phrase "syndrome" did not make evidence of post-abuse symptoms admissible under the current state of the law). Despite this seemingly unbroken line of cases, the notion that Kentucky is better off rejecting all forms of CSAAS evidence has seen its fair share of detractors amongst the members of this Court. *See Lantrip,* 713 S.W.2d at 817 (Wintersheimer, J., dissenting); *Hellstrom,* 825 S.W.2d at 616–17 (Spain, J., dissenting); *Newkirk,* 937 S.W.2d at 696 (Graves, J., dissenting) and *id.* at 696–700 (Willett, S.J., dissenting). Justice Scott introduced his own vociferous dissent in *Sanderson* with the following plea to the majority to reconsider its outmoded and inflexible position:

> Like the overwhelming majority of other states, I believe that such evidence, when not used impermissibly to establish the abuse but, rather, as a viable tool to explain the sometimes confusing and commonly misunderstood behavioral patterns of children who may have been subjected to abuse, should be admissible.

291 S.W.3d at 617 (Scott, J., dissenting).

I echo Justice Scott's sentiments today. Kentucky is one of only six states that traditionally rejected CSAAS testimony on the grounds that it lacks scientific reliability.[13] However, even of these six states, only Kentucky and Tennessee have adopted an iron-clad prohibition against all manner of CSAAS testimony, devoid of any exceptions.[14] Every other jurisdiction

---

**13.** *See Hadden v. State,* 690 So.2d 573 (Fla. 1997); *State v. Stribley,* 532 N.W.2d 170 (Iowa Ct.App.1995); *State v. Foret,* 628 So.2d 1116 (La.1993); *State v. Davis,* 64 Ohio App.3d 334, 581 N.E.2d 604 (1989); *State v. Ballard,* 855 S.W.2d 557 (Tenn.1993).

**14.** *See Petruschke v. State,* 125 So.3d 274, 283 (Fla.Dist.Ct.App.2013) ("[T]he state is free to present evidence of a child's behavior after an alleged incident of sexual abuse if a reasonable inference can be made, within the common knowledge of jurors, that the alleged victim's behavior could have been caused by

sexual abuse."); *State v. Seevanhsa,* 495 N.W.2d 354, 357 (Iowa Ct.App.1992) ("We hold expert testimony regarding CSAAS may, in some instances, assist the trier of fact to both understand the evidence and to determine facts in issue."); *State v. Foret,* 628 So.2d at 1130 ("The expert testimony on why victims might recant or delay reporting is being offered to rebut attacks on the victim's credibility. So long as the expert limits the testimony to general characteristics that would explain delays in reporting, recantations, and omission of details, the testimony will not substitute [the expert's] estimation of

that has taken a position on CSAAS testimony has recognized *at least one* exception. The broadest form of admissibility occurs in the Eighth and Ninth Circuit Courts of Appeals, the D.C. Circuit Court of Appeals, and twenty-eight state courts that have permitted expert testimony to explain generally the common traits of sexually abused children.[15] Other courts have limited an expert's CSAAS testimony to instances where the victim exhibited a specific trait of the syndrome,[16] or for the purpose of rehabilitating a witness's credibility.[17] Altogether, forty-one states recognize the admissibility of CSAAS expert testimony for some purpose.[18]

These changes to the landscape are in large part attributable to the growing scientific acceptance of CSAAS in state and federal courts. In fact, most state courts have accepted CSAAS as scientifically reliable under either the *Daubert* or *Fyre* test, depending on which standard is employed in a given jurisdiction.[19] Margaret H. Shiu, *Unwarranted Skepticism: The Federal Courts' Treatment Of Child Sexual Abuse Accommodation Syndrome*, 18 SOUTHERN CALIFORNIA INTERDISCIPLINARY

credibility for that of the jury.") (internal citations omitted); *State v. Davis*, 64 Ohio App.3d 334, 346, 581 N.E.2d at 612 ("[E]xpert testimony regarding the existence of CSAAS must be limited to the syndrome itself and, therefore, courts must not allow an expert to tell the jury that the victim is believable when the victim states that a particular individual abused her.").

15. See *U.S. v. Two Elk*, 536 F.3d 890 (8th Cir.2008); *U.S. v. Bighead*, 128 F.3d 1329 (9th Cir.1997); *Mindombe v. U.S.*, 795 A.2d 39 (D.C.2002); *W.R.C. v. State*, 69 So.3d 933 (Ala.Crim.App.2010); *State v. Rojas*, 177 Ariz. 454, 868 P.2d 1037 (Ariz.Ct.App.1993); *Chunestudy v. State*, 408 S.W.3d 55 (Ark.2012); *Seering v. Dept. of Social Servcs.*, 194 Cal. App.3d 298, 239 Cal.Rptr. 422 (1987); *People v. Mintz*, 165 P.3d 829 (Colo. Ct.App. 2007); *State v. Favoccia*, 306 Conn. 770, 51 A.3d 1002 (2012); *Wittrock v. State*, 630 A.2d 1103 (Del.1993); *Calloway v. State*, 520 So.2d 665 (Fla.Dist.Ct.App.1988); *Hammock v. State*, 201 Ga.App. 614, 411 S.E.2d 743 (1991); *People v. Pollard*, 225 Ill.App.3d 970, 168 Ill.Dec. 61, 589 N.E.2d 175 (1992); *Steward v. State*, 636 N.E.2d 143 (Ind.Ct.App.1994); *State v. Seevanhsa*, 495 N.W.2d at 357; *State v. Reed*, 40 Kan.App.2d 269, 191 P.3d 341 (2008); *Wimberly v. Gatch*, 635 So.2d 206 (La.1994); *State v. McCoy*, 400 N.W.2d 807 (Minn.Ct. App.1987); *Hall v. State*, 611 So.2d 915 (Miss.1992); *State v. Baker*, 422 S.W.3d 508 (Mo. Ct.App. E.D.2014); *State v. Fleming*, 280 Neb. 967, 792 N.W.2d 147 (Neb.2010); *State v. J.Q.*, 130 N.J. 554, 617 A.2d 1196 (1993); *People v. Ivory*, 162 A.D.2d 551, 556 N.Y.S.2d 742 (1990); *State v. Richardson*, 112 N.C.App. 58, 434 S.E.2d 657 (1993); *State v. Daniel*, 97

Ohio App.3d 548, 647 N.E.2d 174 (1994); *Davenport v. State*, 806 P.2d 655 (Okla.Crim. App.1991); *Commonwealth v. Carter*, 111 A.3d 1221 (Pa.2015); *State v. Edelman*, 593 N.W.2d 419 (S.D.1999); *Gonzales v. State*, 4 S.W.3d 406 (Tex.App.1999); *State v. Huntington*, 216 Wis.2d 671, 575 N.W.2d 268 (1998); *Frenzel v. State*, 849 P.2d 741 (Wyo.1993).

16. See *People v. Bothuel*, 205 Cal.App.3d 581, 252 Cal.Rptr. 596 (1988) (*disapproved on other grounds by People v. Scott*, 9 Cal.4th 331, 36 Cal.Rptr.2d 627, 885 P.2d 1040 (1994)); *State v. Floray*, 715 A.2d 855 (Del.Super.Ct.1997); *People v. Beckley*, 434 Mich. 691, 456 N.W.2d 391 (1990); *State v. Stowers*, 81 Ohio St.3d 260, 690 N.E.2d 881 (1998).

17. See *Bighead*, 128 F.3d 1329; *People v. Stark*, 213 Cal.App.3d 107, 261 Cal.Rptr. 479 (1989); *People v. Nelson*, 203 Ill.App.3d 1038, 149 Ill.Dec. 161, 561 N.E.2d 439 (1990); *State v. Dodson*, 452 N.W.2d 610 (Iowa Ct. App.1989); *People v. Peterson*, 450 Mich. 349, 537 N.W.2d 857 (1995); *Richardson*, 434 S.E.2d 657; *People v. Spicola*, 16 N.Y.3d 441, 922 N.Y.S.2d 846, 947 N.E.2d 620 (2011); *State v. Floody*, 481 N.W.2d 242 (S.D.1992); *Frenzel*, 849 P.2d 741.

18. Seven states (Maine, New Mexico, Nevada, Rhode Island, Utah, Virginia, West Virginia) appear not to have had occasion to address the issue.

19. *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Frye v. United States*, 293 F. 1013 (D.C.Ct.App.1923).

LAW JOURNAL 651, 655–56 (2009). In the thirty years since our *Bussey* decision, social scientists have supported the scientific validity of CSAAS (particularly as it relates to recantation and delayed disclosure). See Thomas D. Lyon, *Scientific Support for Expert Testimony on Child Sexual Abuse Accommodation, in* CRITICAL ISSUES IN CHILD SEXUAL ABUSE: HISTORICAL, LEGAL, AND PSYCHOLOGICAL PERSPECTIVES 107 (Jon R. Conte ed., Sage Publishing 2002); Lindsay C. Malloy et al., *Filial Dependency and Recantation of Child Sexual Abuse Allegations*, 46 J. AM. ACAD. CHILD ADOLESCENT PSYCHIATRY 162, 166 (2007); Irit Hershkowitz, et al, *Dynamics of Forensic Interviews with Suspected Abuse Victims Who Do Not Disclose Abuse*, 30 CHILD ABUSE & NEGLECT 753 (2006); Daniel W. Smith & Elizabeth J. Letourneau, *Delay in Disclosure of Childhood Rape: Results from a National Survey*, 24 CHILD ABUSE & NEGLECT 273 (2000). Not only have empirical studies supported the reliability of the syndrome when it comes to explaining delayed disclosure, strong support for the other elements of CSAAS (secrecy, helplessness, and accommodation) is also present in these studies. *See* Shui, *Unwarranted Skepticism, supra* at 673 n. 194–95. This Court's once "tried-and-true" objections to CSAAS on the basis of lack of scientific acceptance and reliability (while still "tried") are simply no longer "true."

The recent *State v. Favoccia* decision from the Supreme Court of Connecticut demonstrates one common approach to the way CSAAS evidence may be used. 306 Conn. 770, 51 A.3d 1002 (2012). Connecticut's high court has traditionally found CSAAS expert testimony admissible because:

> ...the consequences of the unique trauma experienced by minor victims of sexual abuses are matters beyond the understanding of the average person.... Consequently, expert testimony that minor victims typically fail to provide complete or consistent disclosures of the alleged sexual abuse is of valuable assistance to the trier in assessing the minor victim's credibility.

*Favoccia*, 51 A.3d at 1013 (*quoting State v. Spigarolo*, 210 Conn. 359, 556 A.2d 112, 123 (1989)). The Connecticut Court in *Favoccia* affirmed a lower court's reversal of a defendant's conviction, where a school psychologist's testimony regarding CSAAS characteristics indirectly vouched for the credibility of the victim. *Id.* at 1005. The *Favoccia* Court held that, "although expert witnesses may testify about the general behavioral characteristics of sexual abuse victims, they cross the line into impermissible vouching and ultimate issue testimony when they opine that a particular complainant has exhibited those general behavioral characteristics." *Id.* at 1009. The rule announced in *Favoccia* and embraced by many sister jurisdictions is broader than Justice Scott's proposed rule in the *Sanderson* dissent. He posited that Kentucky should permit the "introduction of [CSAAS] evidence for rehabilitation purposes only and with an accompanying admonition limiting the use to such purpose." *Sanderson*, 291 S.W.3d at 622 (J. Scott, dissenting). There is, however, a common thread between *Favoccia's* rule and the rule advocated in Justice Scott's *Sanderson* dissent, *i.e.*, under no circumstances should an expert "tie" the symptoms of CSAAS to a particular victim. I believe Kentucky should at least adopt the narrower rule set forth in the *Sanderson* dissent. Under this proposed rule, general CSAAS evidence may be introduced for the purpose of rehabilitating the credibility of a child victim. Of course, the expert offering CSAAS testimony would be prohibited from commenting on the particular victim's behavior. Not only is this a fair approach, it is a logical one—where else do we allow a witness's credibility to be destroyed without recourse to rehabilitation?

In that vein, it should be noted that Kentucky has recognized certain types of profile evidence (*e.g.* "battered woman syndrome")[20] as admissible to explain general character traits or behaviors, so long as the testifying expert refrains from offering an opinion as to the specific victim's character or behavior. *See* Robert G. Lawson, THE KENTUCKY EVIDENCE LAW HANDBOOK § 6.30[4] (5th ed.2003). In addition, Kentucky has allowed defendants to offer expert evidence of post-traumatic stress disorder, including generally how people "with PTSD react to tension or stress." *See e.g., Lasure v. Commonwealth,* 390 S.W.3d 139, 144 (Ky.2012). Moving closer to the issues before us, in a sexual assault on a ten-year old girl, this Court unanimously accepted evidence of "emotional injury" through the testimony of the victim's mother. *Dickerson v. Commonwealth,* 174 S.W.3d 451, 471–72 (Ky.2005). This Court held that evidence that the victim had visited a rape crisis center was indicative of emotional injury, and therefore "relevant to prove that she was sexually assaulted." *Id.* at 472. Nevertheless, Kentucky currently stands on the outermost fringe of the minority when it comes to the acceptance of CSAAS evidence while almost all of our sister states recognize the value of CSAAS evidence, whether it be in assisting the trier of fact in understanding the nuances of post-child abuse behavior or rehabilitating a child victim whose credibility has been attacked.

Quite simply, crimes against children are *different.* There are evidentiary challenges in child abuse cases that simply do not arise in other cases. Very recently, the United States Supreme Court weighed in on the question of whether the Confrontation Clause prohibits the admission of statements made by child victims to non-law enforcement witnesses. While I am aware that King has not raised a challenge based on his confrontation rights, I believe that the recent Supreme Court decision warrants mention. In *Ohio v. Clark,* 576 U.S. ——, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015), the Supreme Court unanimously agreed that a conversation between a three-year old boy and his preschool teachers in which allegations of physical abuse were uncovered was not testimonial in nature,[21] and was therefore admissible at trial under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The context in which the statements were made—informally by the very young child, in response to questions posed by teachers—is noteworthy because clearly the child was not then in danger yet the Court found it to be an "emergency situation" given the child would be returning to the potential abuser at the end of the school day.

By limiting a party's ability to rehabilitate a child victim's credibility with scientifically valid evidence, this Court has introduced and validated extraordinary impediments to the prosecution of child sexual abuse cases. Here, Thomas was cross-examined about his failure to "cry out" at the time of the abuse (when his

---

**20.** [E]vidence regarding this battered wife syndrome might be of assistance to the jury as trier of fact because it tends to explain why a person suffering from the syndrome would not leave her mate and would be driven by fear of continuing episodes of increased aggression against herself to perceive certain conduct was necessary in her self-defense. *Commonwealth v. Rose,* 725 S.W.2d 588, 590 (Ky.1987) (*overruled by Commonwealth v. Craig,* 783 S.W.2d 387 (Ky.1990) (to the extent that battered wife syndrome testimony had to be from a psychiatrist or psychologist; it can now come from other witnesses, such as a spouse abuse counselor.)).

**21.** Specifically, the Supreme Court found that the "primary purpose" of the statements was aimed at "identifying and ending" a "threat" to the child, and not calculated to result in a criminal prosecution.

young cousin was present in the same house), and his failure to tell his mother immediately after he returned home. Although this reluctance and "delayed" reporting are common, rehabilitation was not available in Kentucky. I can think of no other example in criminal prosecutions where similarly restrictive rules are applied to allow a witness to be impeached without the option of rehabilitation.[22]

Our position on CSAAS evidence is outdated and wrong. While the majority laments that no one has attempted to establish the validity of CSAAS in the trial courts, this Court's relentless criticism of anything remotely approaching CSAAS testimony has been the obvious barrier. I, and a growing number of the members of this Court, am more than willing to consider what forty-one sister states already recognize, the admissibility of CSAAS testimony. I agree that a proper record must be made in the trial court and, having considered the applicable legal and scientific literature, I am confident that it can be made.

Additionally, I note that counsel for King made numerous objections to the portions of Thomas's mother's testimony that counsel characterized as CSAAS evidence, citing our then-recent decision in *Blount.* The trial court, for the most part, sustained those objections. However, when Detective Anderkin briefly remarked on the tendency of child victims to delay reporting abuse, counsel stood silent. Given counsel's persistent attempts to limit the mother's testimony on CSAAS grounds, the apparent unwillingness to make similar objections to Detective Anderkin's statements (regarding both the delayed reporting and the Child Abuse

Task Force, discussed *infra*) raises the specter of invited error. *See e.g., Wright v. Jackson*, 329 S.W.2d 560, 562 (Ky.1959) ("We have often held that a party is estopped to take advantage of an error produced by his own act."). The failure to raise an objection to Detective Anderkin's statements reflects, in my view, a volitional choice on the part of King's counsel—a choice that indicates satisfaction with the "trial court's approach" or, in this case, satisfaction with *not* challenging the testimony. *See Blount v. Commonwealth*, 392 S.W.3d 393, 398 (Ky.2013).

## II. The Admission of Detective Anderkin's "Task Force" Testimony, if Error, Was Harmless.

Finally, I cannot agree with the majority's conclusion that Detective Anderkin's "Task Force" testimony was palpably erroneous. Assuming the discussion of the Laurel County Child and Sexual Abuse Task Force constituted error, it did not result in manifest injustice.

The lack of DNA evidence in this case featured prominently in King's defense. The Commonwealth, therefore, was deliberate in using Detective Anderkin's testimony to reflect a comprehensive investigation. Certainly, a child sexual abuse allegation demands investigative strategies and techniques specific to that crime. As noted by the majority in a footnote, the Laurel County Task Force discussed by Detective Anderkin is (we assume) the local division of the Kentucky Multidisciplinary Commission on Child Sexual Abuse. *See* KRS 431.650. Detective Anderkin's statements concerning the purpose and function of the Task Force were calculated to explain her thorough investigation to the jury, and the fact that the

---

**22.** The only example that is remotely similar is this Court's rejection of the curative admissibility of polygraph results. However, polygraph examinations are still viewed as scientifically unreliable. Therefore, the rehabilitative qualities of CSAAS evidence is similar to polygraph evidence *only* insofar as this Court has rejected both.

Task Force was involved in King's case is simply reflective of the typical investigative processes employed when child sexual assault is alleged. In short, this case was handled like all other alleged child sexual assault cases.

Moreover, I find the majority's reliance on *Hoff v. Commonwealth,* 394 S.W.3d 368 (Ky.2011), difficult to understand. The expert witness in *Hoff,* a physician, improperly vouched for the veracity of the young victim's statements, repeating portions of the victim's forensic interview at trial, including the victim's identification of the defendant as the perpetrator. 394 S.W.3d at 378–79. Here, the challenged testimony concerned the steps taken by Detective Anderkin in her investigation prior to the indictment. The jury was well aware that the grand jury returned an indictment, otherwise no trial would have commenced. Therefore, the essence of Detective Anderkin's testimony was that she engaged in an investigation of the allegation against King, which included, as required by Kentucky statute, presenting the evidence to a Task Force which determined whether the matter should go before a grand jury. Nothing in her testimony suggested that the Task Force replaced a trier of fact in a criminal prosecution. The prejudicial effect of the physician's testimony in *Hoff* was far greater than any so-called bolstering that could have been attributed to the testimony regarding presentation of this case to the Task Force.

Obviously, a defendant is to be presumed innocent and may be convicted only upon lawful evidence establishing guilt beyond a reasonable doubt. The detective's Task Force testimony in this case implicates, to some extent, the concerns about the presumption of innocence expressed by the United States Supreme Court in *Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978). In that case, the Court held that weak evidence of the defendant's guilt—little more than the victim's word—together with "skeletal" jury instructions regarding the Commonwealth's burden of proof beyond a reasonable doubt and several suggestions by the prosecutor—including references during opening and closing statements to the grand jury's indictment—that the jury could infer guilt from the defendant's mere status, as such, combined to entitle the defendant to a requested instruction on the presumption of innocence. Absent such an instruction, the Court held, the circumstances in that case "created a genuine danger that the jury would convict petitioner on the basis of those extraneous considerations, rather than on the evidence introduced at trial." 436 U.S. at 487–88, 98 S.Ct. 1930.

Here, by contrast, although the Commonwealth's case against King likewise rested heavily on the victim's testimony, there is no genuine danger that the jury based its verdict on "extraneous considerations" rather than on the Commonwealth's trial evidence. Unlike *Taylor,* where the prosecutor several times invited the jury to infer guilt from the defendant's mere status as such, the prosecutor in this case never invited such an inference. As the majority notes, the detective referred to and described the Laurel County Child Sex Abuse Task Force in the course of describing her investigation of the case. A Task Force review, according to the detective, is a prerequisite in that county to submission of a child sex-abuse case to the grand jury. That the Task Force approved submission of the case to the grand jury, does not, however, as the majority would have it, in any way imply that a "committee of esteemed local officials and respected sex abuse experts ... substantiated [the child's] claims." Like the indictment itself, Task Force approval indicates only that the Task Force thought the matter merited further looking into. That the parties understood the detective's "Task

Force" reference this way is clear from the facts that defense counsel made *no* objection to it and the prosecutor *never* otherwise mentioned it, neither in his opening nor in his closing statements. Since King's trial was fundamentally fair, in my view, notwithstanding an irrelevant and what may well have been an erroneous reference to the Task Force, the error, if any, cannot be deemed palpable and does not entitle King to relief.

I am troubled moreover by the practice of finding palpable error on appeal where able trial counsel clearly has elected not to raise the issue before the trial court. Here, King was represented by two attorneys who vigorously and astutely volleyed objections during the Commonwealth's case-in-chief, including CSAAS-type objections to the mother's testimony with specific references to *Blount v. Commonwealth.* They also cross-examined Detective Anderkin about her investigation, questioning her repeatedly about why certain pieces of evidence were not collected and why evidence was not tested for the presence of DNA, and yet King's counsel elected not to object to the detective's testimony regarding the Task Force. What the majority now finds "palpable" error in that brief portion of Detective Anderkin's testimony strikes me as very possibly "invited." Under these circumstances, I cannot possibly agree that the statements discussed herein rendered King's trial fundamentally unfair. *Elery v. Com.,* 368 S.W.3d 78, 100 (Ky.2012).

For these reasons, I strongly dissent, and would affirm the conviction and sentence.

Barber and Keller, JJ., join.