RENDERED: DECEMBER 14, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0244-MR

GREGORY STEPHENS                                                  APPELLANT

V.              ON APPEAL FROM HARLAN CIRCUIT COURT
HONORABLE KENT HENDRICKSON, JUDGE
NO. 21-CR-00011

COMMONWEALTH OF KENTUCKY                           APPELLEE

**OPINION OF THE COURT BY JUSTICE THOMPSON**

**REVERSING AND REMANDING**

Gregory Stephens appeals from the Harlan Circuit Court's judgment and sentence after a jury trial, in which he was convicted of first-degree rape and being a persistent felony offender in the second-degree (PFO-2). Stephens argues that various trial errors rendered his trial fundamentally unfair. We agree, and reverse and remand because palpable error occurred.

The entirety of the evidence for the Commonwealth was derived from the statements of the child victim, Amy.[1] Amy testified that Stephens, her mother's "on-again/off-again" boyfriend, raped her at his trailer when she was twelve years old. She was certain about the event, certain about Stephens being her rapist, and certain about where she was raped, explaining she was very

---

[1] Amy is a pseudonym employed by the Court to protect the privacy of the child. We also refrain from naming Amy's brother, mother, or the members of the family with whom she lives.

familiar with Stephens and his home. Amy's only uncertainty was when exactly the rape occurred. While she was a very credible witness, reversal is required because in this "he said, she said" case, the Commonwealth was erroneously allowed to elicit testimony from additional witnesses to bolster Amy's testimony with her prior hearsay statements and to vouch for her credibility.

Stephens testified and denied ever raping Amy. There was no physical evidence. The only witness who could have confirmed or denied that Amy was taken to Stephens's trailer and the related circumstances of this event, Amy's mother, was not called to testify as a witness by either party.

Stephens's defense was innocence and that it would have been almost impossible for him to commit the crime during the identified time frame.[2] Detective Roddy Sturgill testified that Amy's mother in her interview indicated that she had not seen Stephens since 2016, when she broke up with him; Stephens testified he had not seen Amy's mother or Amy since 2016.

The indictment stated that the rape occurred on or around October 28, 2018; this date was determined from Amy telling Kayla Byrd (a social worker and a forensic investigator with a child advocacy center) that the rape occurred before Halloween. Amy testified she misspoke to Byrd because she was nervous and the crime occurred after Halloween in 2018, when it was cold out, but before she started staying with the deputy jailer's family; the deputy jailer testified that Amy began staying with his family on November 12, 2018, and

---

[2] Certainly, unusual circumstances can be true, and the crime being committed at a different time does not mean that the crime did not occur as described by Amy.

that when Amy told him about the crime two years after she began staying with him, she said it happened around Halloween.

Detective Sturgill testified that Stephens was incarcerated from September 2017 until November 6, 2018, when he was released on home incarceration. Probation and Parole Officer Adam Tyler Smith and Stephens both testified that Stephens was released onto home incarceration on November 6, 2018, to Stephens's mother's address (a different address than where his trailer was located) until Stephen's home incarceration terminated on November 30, 2018. Officer Smith explained that Stephens could leave his mother's residence for appropriate preapproved purposes.

To reconcile the timeline, Amy would have needed to be raped by Stephens between November 6, 2018, and November 12, 2018, while Stephens was on home incarceration at his mother's address, a difficult but not impossible scenario. Under these circumstances, it was prejudicial to have Amy's testimony improperly bolstered by multiple witnesses. Both the deputy jailer and Byrd were allowed to identify Stephens as Amy's rapist based on Amy's hearsay statements and the deputy jailer also provided a complete hearsay account of Amy's rape. Detective Sturgill, the deputy jailer and Byrd were all allowed to vouch for Amy's credibility. Additionally, the deputy jailer was also improperly permitted to testify during the guilt phase of the trial about the impact the rape had on Amy. We cannot allow Stephens's conviction to stand given such obvious and palpable combined errors.

3

## I. FACTUAL AND LEGAL BACKGROUND

Amy was twelve when she began living with the deputy jailer, his wife, and their family. Before that, Amy had an unstable living situation with her brother's father. The deputy jailer's daughter, who went to school with Amy and was on a cheerleading team with her, told her parents that Amy was walking around in a t-shirt and broken flipflops in cold weather. On Tuesday, November 12, 2018, the deputy jailer's family invited Amy for a meal and gave her basic necessities. Amy spent the night and, with her brother's father's permission, continued to stay with the deputy jailer's family. Eventually, the deputy jailer and his wife became Amy's guardians.

In October 2020, Amy disclosed to the deputy jailer and his wife that she had been raped two years earlier by Stephens when Amy's mother took her to Stephens's trailer home and left her there. Stephens was indicted for first-degree rape, with the indictment specifying this took place on or around October 28, 2018.

Detective Sturgill testified about his investigation. He testified he watched via closed circuit television as Amy was interviewed by Byrd and, based on what she said, he went and talked with the county attorney who issued an arrest warrant. In answering a question about whether an arrest warrant is typically issued immediately, Detective Sturgill stated "if they hear what we have to say and they believe it as well, they'll go ahead and issue the warrant." When additionally asked if there was a reason he decided to get the arrest warrant immediately, he explained "[a]fter hearing [Amy's] story and

4

listening to her and listening to some of the facts that she provided in the case, I believed her story[.]"

Detective Sturgill testified he then went to the Harlan County Detention Center where Stephens was already lodged, issued the warrant and then interviewed Stephens. According to Sturgill, Stephens denied all the allegations and expressed that he did not know why Amy would think he did it, explaining he was incarcerated prior to when the allegations were made. Detective Sturgill explained he next went to get the jail records and found out that Stephens had been incarcerated from September 2017 until he was released onto home incarceration on November 6, 2018.

Detective Sturgill stated it was hard to get an interview with Amy's mother, but he was finally able to interview her when she was incarcerated at the Warren County Detention Center. Amy's mother indicated she was unsure of dates and times, but that she had last dated Stephens back in 2016. During cross-examination, Detective Sturgill stated that Amy's mother indicated she had not had any communication with Stephens since her relationship with Stephens ended in 2016; the relationship ended badly, and she sought a protective order in 2016.

The deputy jailer testified extensively about how Amy came to live with them, his family's involvement in church and Amy's involvement with them and their church. He explained that Amy disclosed the rape to them because it was required by "her spiritual race", "she was living a lie by not being honest", and

"she didn't feel like she could get any closer to God until she spoke her truth and was honest about what she'd been through."

The deputy jailer then recounted in great detail, and without any objection, Amy's entire account to him about the rape. The deputy jailer testified Amy told him that in 2018, around the time of Halloween, when Amy was twelve, her mother came to pick Amy up. According to Amy, she did not know where they were going, but her mother took her to Stephens's home.

The deputy jailer explained that Amy told him that she did not want to go to Stephens's home because Stephens had previously been abusive toward Amy when she tried to intervene in abuse happening to her mother, resulting in Amy going to school with marks and a black eye, and telling the school counselor what had occurred. Later, the deputy jailer explained that Amy had previously told him about the physical abuse involving Stephens and he believed Stephens had gone to jail for it.

The deputy jailer explained that Amy told him that despite her objection, Amy's mother drove her to Stephens's home. The deputy jailer testified that Amy told him that after she and her mother arrived at Stephens's home, Amy's mother made Amy take a pill and left her there alone with Stephens while her mother went to Walmart. He explained that although he and his wife had asked, Amy did not know what type of pill it was.

The deputy jailer testified that according to Amy, when Amy was left alone with him, "Greg Stephens grabbed her, pushed her face down in the

6

couch and raped her from behind." The deputy jailer repeated over and over the name "Greg Stephens" in reciting Amy's account of what occurred.

The deputy jailer also stated that Amy was certain of what had happened and clear that Stephens had done it, saying that Amy knew how to get to Stephens's home and "[t]here is no question of identifying who the attacker was."

The deputy jailer also testified that Amy had problems when she tried to sleep, from the time she began to live with them, although it was somewhat better after she disclosed the rape to him. He explained that Amy suffers from night terrors, sees dark figures, and has an inability to sleep. He also testified that Amy wants to have a job but fears who might come in there, and that he does not want her fear to control her life.

On cross-examination, the deputy jailer admitted that in his role as deputy jailer, he was familiar with who is in the jails and knew that Stephens was incarcerated and not released onto home incarceration until November 6, 2018.

Amy testified that shortly before she began to live with the deputy jailer's family, her mother picked her up from her brother's father's home and took her to Stephens's house, a trailer. Amy explained that when her mother got her, she did not know where they were going, but as they were driving, she recognized the route to Stephens's home, which Amy knew well because she had been in his home many times. Amy explained her mother always went back to Stephens. Amy testified she vehemently objected to going to Stephens's

7

home, but her mother said she needed to go to there to get her purse. Amy explained she did not want to go to Stephens's home as he had been physically abusive to her mother many times, and also hit her brother and her when they tried to intervene.[3]

Amy testified her mother insisted they needed to go to Stephens's home but given her protests initially her mother gave Amy permission to remain in the car. However, once they arrived her mother yelled at her and demanded she get out of the car. Amy stated that when they walked in, she sat on the couch and her mother went back into Stephens's bedroom and remained inside for five to ten minutes. Then her mother came out and told her to stay there.

Amy testified she told her mother "I am not," and then Stephens walked out of his bedroom and "a fear came upon me" so she "piped down." Then her mother told her to take a pill, she objected, and her mother insisted. Amy explained she took the pill because she was afraid of Stephens; she drank it with her mother's sweet tea, which she hated.

Amy testified that after her mother left, Stephens told her that she could watch cartoons. When she picked up the remote from by the television, he came up to her and she believed he was going to beat her, so she backed up to the wall, and closed her eyes. Then she felt him softly putting her hair behind her ear, and she knew what was going to happen. Amy moved away, and Stephens picked her up and threw her on the couch. She was pinned down

---

[3] Amy did not state when the prior physical violence by Stephens occurred.

8

because he was sitting on her chest; she was hollering, hitting, and fighting him, but it did not have any effect.

Amy testified that Stephens pulled her shorts off and her underwear down to her ankles. She got loose for a moment and got up, but Stephens turned her over and pressed her head into the corner of the couch and then "stuck his penis into my vagina" which caused the "most indescribable pain." Amy testified she kept trying to fight, but the more she fought, the more it hurt, and she was becoming weaker and could not breathe.

Amy described hearing a car door, a dog barking, and then Stephens getting up. At that point she hit the floor trying to get away. Amy reported not remembering her mother arriving, and not remembering most of the car ride back to her brother's father's home; she was dizzy and did not feel right. Amy testified that the next few days she felt mentally numb, "not okay at all" and wondering why she was "still on the earth if life was going to be like this."

Amy testified that when she disclosed the rape to the deputy jailer and his wife, she told them the details of what happened but did not tell them an exact date. She explained that the rape occurred when she was living with her brother's father and "not long at all before" she began living with the deputy jailer's family, "right before" or "soon before" then, around Halloween, but she was not sure of an exact date, just that it occurred when there was colder weather (the deputy jailer previously testified Amy started staying with them on November 12, 2018). Amy explained when she told the interviewer about when it occurred, she meant to tell her it happened around Halloween but

9

accidentally told her it was before Halloween, explaining she misspoke to her because she was nervous.

Amy positively identified photos of Stephens's trailer, remembered the address, and stated that the incident occurred there, by the railroad tracks. The photos were introduced into evidence.

Byrd testified she was a forensic interviewer at the children's advocacy center, had a master's degree in social work, had previously conducted over three hundred forensic interviews, and had completed a five-day training course on forensic interviewing. Byrd explained that upon the conclusion of conducting a forensic interview, she could then refer the child for counseling or for a medical examination.

Byrd explained Amy was emotional, and that Byrd guided the interview in a nonleading, nonsuggestive manner. Byrd repeatedly stated that when she interviewed Amy that she communicated her story "very well" with "detail." Byrd recommended trauma therapy for Amy.

Byrd specifically recounted that Amy told her that "Gregory Stephens, which was mother's boyfriend, put his 'bad part' in her" and Byrd was able to clarify that meant he had put his penis in her vagina. Byrd confirmed Amy told her this incident happened before Halloween, in October. Byrd testified she found Amy's story to be credible but later clarified that she could not say whether Amy was telling the truth or not but had no reason to believe she would lie about "such serious allegations with detail."

10

Officer Smith testified that Stephens was incarcerated until he was released on home monitoring to his mother's house on November 6, 2018, and remained there on home incarceration until it terminated on November 30, 2018. Officer Smith explained that Stephens could leave his home for prearranged purposes, including to attend church, purchase groceries, to look for a job and go to work.[4]

Stephens testified he was in custody at the Harlan County Detention Center on October 28, 2018, which according to the indictment was "on or about" the date the rape occurred. He explained he was not released until November 6, 2018, and that day was placed on home incarceration with an ankle monitor at his mother's home and lived with his mother and his brother on monitoring until November 30, 2018. Stephens testified he could not step five feet outside of his mother's home without getting a call and having the police show up. He stated he only left his mother's home once during that time after asking for permission and naming his destination as required twenty-four hours prior to the outing and was monitored during that time.

Stephens admitted to dating Amy's mother and to knowing Amy but denied having seen Amy's mother or Amy after he stopped dating Amy's mother in 2016. He denied ever hitting or touching Amy or her brother and stated Amy made that up. Stephens testified he argued with Amy's mother, defending himself against Amy's mother when she was high on drugs and acting crazy,

---

[4] Officer Smith did not testify as to whether Stephens had ever made any arrangements to leave his mother's house while he was on home incarceration.

11

but admitted that Amy's mother had gotten a domestic violence order (DVO) against him. Stephens denied raping Amy and testified that Amy made up the account of the rape.

The jury found Stephens guilty of first-degree rape. It also found him guilty of PFO-2. The jury recommended he serve twenty years of incarceration on the rape conviction, enhanced to twenty-five years for being a PFO-2.

## II. ANALYSIS OF ARGUMENTS

Stephens raises several arguments on appeal regarding trial errors: (1) the deputy jailer's testimony as a whole (which included bolstering hearsay testimony, vouching testimony regarding Amy's certainty and religious reasons for coming forward, extensive irrelevant background information including religious belief by Amy and the deputy jailer, and victim impact evidence), violated Stephens's rights; (2) Byrd's testimony contained improper hearsay bolstering and vouching of Amy testimony; (3) testimony regarding physical abuse of Amy, her brother and her mother was irrelevant and improper character evidence; (4) the prosecutor should not have been allowed to ask Stephens to characterize other witnesses as lying; (5) the prosecutor committed misconduct in closing argument; (6) the prosecutor tainted the penalty phase by presenting evidence about prior charges that were dismissed or amended down; and (7) cumulative error occurred.[5]

---

[5] We have reordered Stephens's arguments to address the reversible errors first, combining the discussion of errors that pertain to more than one witness to avoid unnecessary duplication of the discussion. As we are reversing, we omit addressing cumulative error as a separate issue.

The trial court erred in permitting the witnesses to improperly bolster Amy's testimony in this close case through repeating her hearsay statements naming Stephens as her rapist and relating what he did to her, vouching for her credibility, and allowing victim impact testimony during the guilt phase of the trial. Even though these errors were not preserved, as established by a trio of our prior cases, *Chavies v. Commonwealth*, 374 S.W.3d 313 (Ky. 2012), *Alford v. Commonwealth*, 338 S.W.3d 240 (Ky. 2011), and *Hoff v. Commonwealth*, 394 S.W.3d 368 (Ky. 2011), reversal is warranted for such a serious and prejudicial breach of our evidentiary rules which rendered Stephens's trial fundamentally unfair.

**A. Reversable Errors**

Stephens argues that the deputy jailer and Byrd were wrongfully allowed to relate Amy's hearsay statements and to vouch for her credibility and truthfulness. He also argues that the deputy jailer was wrongfully allowed to testify about the impact the rape had on Amy's life during the guilt phase. These issues were not preserved. Stephens seeks palpable error review.

Although these errors were not objected to, the familiar standard of review applies; whether a remedy is required then depends upon whether the error is palpable. "An appellate court's standard of review for admission of evidence is whether the trial court abused its discretion." *Brewer v. Commonwealth*, 206 S.W.3d 313, 320 (Ky. 2006). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable,

13

unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

### 1. Hearsay Statements

Kentucky Rules of Evidence (KRE) 802 provides that unless it qualifies for an exception, hearsay testimony is not admissible. No general hearsay exception allows a friend, parental figure, guardian, police officer, or other law enforcement personnel to testify to the prior statements of a victim of sexual assault. *See Chavies,* 374 S.W.3d at 322 (no hearsay exceptions for statements made to a friend or teacher); *Alford,* 338 S.W.3d at 246 (no hearsay exceptions for statements made to a police officer); *Prater v. Cabinet for Human Res.,* 954 S.W.2d 954, 959 (Ky. 1997) (no hearsay exceptions for statements made to social workers).

There is a hearsay exception for statements made for purposes of medical treatment, pursuant to KRE 803(4). Generally, licensed social workers who can refer clients for therapy come under this hearsay exception. *See Cabinet for Health & Fam. Servs. v. A.G.G.,* 190 S.W.3d 338, 343-44 (Ky. 2006). However, such exception does not reach as far as allowing medical professionals to testify as to the identity of the perpetrator. *Hoff,* 394 S.W.3d a 372-74. "This Court has recognized that it is highly prejudicial for a doctor or other professional to repeat the hearsay statement of a child identifying the child's abuser." *Id.* at 373.

KRE 801A(a)(2) contains a narrow hearsay exception, but it does not apply here as Stephens did not imply a charge of recent fabrication by Amy.

14

*See Dickerson v. Commonwealth,* 174 S.W.3d 451, 472 (Ky. 2005); *Edmonds v. Commonwealth,* 433 S.W.3d 309, 313-14 (Ky. 2014). "A witness cannot be corroborated by proof that on previous occasions he has made the same statements as those made in his testimony." *Dickerson,* 174 S.W.3d at 472.

### (a) The deputy jailer should not have been permitted to testify about Amy's statements describing her rape and identifying her rapist as no hearsay exception permitted such testimony.

Stephens argues that the entirety of the deputy jailer's testimony recounting Amy's allegations against Stephens was inadmissible hearsay. Stephens explains that there is no exception which would allow the deputy jailer to relate statements from Amy about her sexual abuse and such testimony unfairly bolsters Amy's own testimony and is highly prejudicial. Stephens additionally argues that where Amy's testimony was also presented, the deputy jailer's testimony to the same events also lacks probative value. The Commonwealth counters that the deputy jailer's statements relating what Amy told him were not inadmissible hearsay because they were offered not for the truth of the matter asserted but as proof that Amy disclosed the rape to the deputy jailer.

We disagree with the Commonwealth that Amy's statements to the deputy jailer were not hearsay because they were only admitted to establish that she made a disclosure to him. The detailed allegations which the deputy jailer related from Amy went far beyond this scope.

The Commonwealth Attorney asked the deputy jailer if Amy "at some point came to him and made a very specific report." The deputy jailer replied

15

that "she told my wife that she had been raped and by who" and then his wife called him into the room and "[Amy] explained to me what she had just explained to my wife." This exchange and others about the timeline of when Amy disclosed was sufficient to establish that Amy told them about the rape.

However, the Commonwealth did not cease its questioning about the underlying incident after such testimony. Instead, the Commonwealth Attorney asked further questions which elicited detailed hearsay statements. Such testimony had no other purpose but to bolster Amy's anticipated testimony:

Q: And in telling you what happened to her, was she able to give you specific details?

A: She told us, in 2018 around the time of Halloween, her mother came to pick her up to spend time with her. Her mother was not allowed to legally spend time with her, be around her, but when you have a child that is cast to the winds with really no adult supervision, her mother came and went as she pleased. She came to pick [Amy] up to spend time with her. [Amy] didn't know where they were going, she just wanted to see her mother. She was twelve years old at the time. She told me her mother took her to Greg Stephens's house and that she was not comfortable being there because she had seen violence from Greg Stephens in the past. She had seen him be abusive towards her mother. She is a child who tried to intervene with him being violent towards her mother which led to him being violent towards her. [Amy] told us that she went to school with marks, and I believe she told me a black eye and the school pulled her aside to speak with a counselor, the counselor asked her what happened, and she freely told her that Greg Stephens had physically attacked and abused her as she tried to intervene in the abuse happening to her mother. Her mother took her to Greg Stephens's residence on this day. She said they weren't there long when her mother said, "I need to run to Walmart, and I need you to stay here." She said her mother handed her some type of pill, she doesn't, she . . . she was twelve, she really can't even tell us what it was she gave her. And . . . she said her mother left her alone in the house with Greg Stephens with the excuse that she had to run to Walmart. She told me that Greg Stephens grabbed her and pushed her face down in the couch and raped her from behind.

16

In *Chavies*, *Alford*, and *Hoff*, our Court rejected that the admission of hearsay testimony in which a witness repeated a victim's prior statements regarding sexual abuse was harmless. Instead, these opinions emphasize that "[w]e have consistently recognized that such testimony is highly prejudicial and unfairly bolsters the credibility of the allege victim." *Chavies*, 374 S.W.3d at 322. *See Alford*, 338 S.W.3d at 246 (repeating this same pronouncement almost verbatim).

These cases also recognized that such an error has the most impact and is at its apex where the victim's in-court and out-of-court statements are the only evidence linking the defendant to the commission of the sexual assault and the resolution of the case comes down to credibility, with the jury weighing the victim's word against the defendant's word. *Chavies*, 374 S.W. 3d at 323; *Alford*, 338 S.W.3d at 246-47. *See Hoff*, 394 S.W.3d at 377 (extending such reasoning when the case only *largely* depends upon the victim's credibility).

The trial court here abused its discretion in admitting the deputy jailer's substantive hearsay evidence which bolstered Amy's testimony.

### (b) Byrd should not have been permitted to testify about Amy's identification of Stephens as her rapist as no hearsay exception permitted such testimony.

Stephens argues that Byrd, a social worker, could not properly relay Amy's identification of Stephens as her rapist because the hearsay exceptions for purposes of medical treatment do not extend to the identity of the perpetrator. The Commonwealth admits that Byrd's testimony relaying Amy's

17

identification of her rapist is impermissible hearsay but argues this error does not require reversal because "[t]he identity of who the perpetrator was or who could have raped [Amy] was not at issue."

Byrd's testimony positively identified Stephens as Amy's rapist:

Q: Was [Amy] able to specifically tell you about intercourse that may have occurred?

A: Yes.

Q: Do you remember how she described that?

A: She stated that Gregory Stephens, which was her mother's boyfriend, put his "bad part" in her. I asked her what a "bad part" was, and she spelled out P. E. N. I. S. and I confirmed she was spelling penis and I confirmed she said he put it in her vagina.

Byrd's testimony that Amy identified Stephens as her rapist is improper hearsay testimony that does not qualify for any exception. This error was obvious and undisputable. Byrd should not have been allowed to make this statement.

## 2. Vouching Statements

A witness cannot vouch for the truthfulness of another witness either directly or indirectly. *Hoff*, 394 S.W.3d at 376. "For example, physicians . . . may not give an opinion as to the truthfulness of their patient." *King v. Commonwealth*, 472 S.W.3d 523, 531 (Ky. 2015).

"[T]his Court has repeatedly held that no expert, including a medical doctor, can vouch for the truth of the victim's out-of-court statements . . . even . . . *indirectly* . . . ." *Hoff*, 394 S.W.3d at 373. An example of inappropriate indirect vouching occurred in *Bell v. Commonwealth*, 245 S.W.3d 738, 744-45

18

(Ky. 2008), *overruled on other grounds by Harp v. Commonwealth*, 266 S.W.3d 813 (Ky. 2008), when a social worker stated "that a child sounded 'spontaneous' and 'unrehearsed' in describing sexual abuse" as the social worker's opinion that the child was truthful "was implicit in her statements, and so her testimony was impermissible bolstering." *Hoff*, 394 S.W.3d at 373 (internal citations omitted, quoting from *Bell*). "This Court has held that social workers and psychologists are not qualified to testify that they believe a child has been sexually abused based on the child's demeanor." *Id. See Hall v. Commonwealth*, 551 S.W.3d 7, 18 (Ky. 2018) (internal citation footnotes omitted) (in discussing vouching in a closing statement the Court explained "improper vouching . . . [can involve] comments that imply . . . special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony").

In *Hoff*, our Court concluded that a physician's statement that he did not disbelieve the victim's story was improper bolstering culminating in palpable error. *King*, 472 S.W.3d at 531 (citing *Hoff*, 394 S.W.3d at 375). Similarly, in *King*, "the testimony that the Task Force had 'recommended' prosecution is the same thing as saying that it was the opinion of the members of the Task Force that [the victim's] charges were true [and] thus impermissibly bolstered the victim's testimony with the opinion of Task Force members." *Id.* The Task Force's belief was irrelevant and prejudicial and its "only purpose . . . was to improperly influence the jury's perception of [the victim's] account by

19

suggesting that knowledgeable and reputable members had already accepted his testimony as truthful." *Id.* at 531-32.

In *Ruiz v. Commonwealth*, 471 S.W.3d 675, 684 (Ky. 2015), a case which was already being reversed, our Court explained that a police officer's testimony that after hearing the six-year-old victim's account "he 'found probable cause' to prepare a report so further investigation would ensue[,]" was problematic:

> Although ambiguous, [the officer's] testimony could be readily understood to mean that he personally believed [the victim's account]. While it was certainly relevant and admissible for [the officer] to explain that he filed his report and further investigation followed, his characterization of the process as having 'found probable cause' certainly expresses sufficient belief in the truthfulness of the victim to run afoul of the rule against vouching, and more importantly, the officer's belief that "probable cause" existed is absolutely irrelevant.

*Id.*

However, testimony that is based not on the victim's prior consistent statements but on the witness's own personal knowledge is not thereby barred just because it is consistent with the victim's prior consistent statements. *Edmonds v. Commonwealth*, 433 S.W.3d 309, 314 (Ky. 2014).

### (a) The deputy jailer should not have been permitted to indirectly vouch for Amy's credibility based on her being certain of the identity of her attacker.

Stephens argues that the deputy jailer's testimony about the certainty with which Amy identified Stephens was impermissible bolstering by vouching for her credibility. The Commonwealth disagrees that the deputy jailer's

testimony about Amy's certainty was impermissible, arguing it was at most indirect vouching which is not palpable error.

After the deputy jailer finished testifying about Amy's account of what happened to her, he then gave reasons why her account ought to be believed despite her taking two years to disclose that the rape occurred:

> Q: Did [Amy] disclose this [rape] soon after she came to live with you?
>
> A: No, it took time. It took about . . . [two years] . . . . She knows where he lives. She can tell you in any direction in Harlan County to go to get to his house. She knows the man. She knows who Greg Stephens is. She knows where his house is. I mean she has a history. It's not like she doesn't know who hurt her, who he is. There's no question of identifying who the attacker was.
>
> Q: So that was going to be my next question, did she have any trouble whatsoever, any hesitation, in naming who her attacker was?
>
> A: No, no.

Arguably, the portion of the deputy jailer's testimony in which he stated that Amy could tell you how to get to Stephens's home from anywhere in Harlan County and knew where his house was located may have been based on the deputy jailer's personal knowledge. Perhaps Amy had demonstrated this knowledge when they were driving around which he could confirm by knowing where Stephens' home was located.[6]

However, the deputy jailer also made other vouching statements that could not have come from his own personal knowledge: "She knows the man.

---

[6] How easy or difficult of a feat that was is subject to interpretation. Stephens testified that everyone in the county knew where he lived.

21

She knows who Greg Stephens is . . . . I mean she has a history. It's not like she doesn't know who hurt her, who he is. There's no question of identifying who the attacker was." By making such statements, the deputy jailer was making an indirect vouching statement that he believed Amy based on her own certainty, rather than his own independent knowledge of what occurred. Allowing such testimony was error.

**(b) The deputy jailer should not have been permitted to indirectly vouch for Amy's credibility based on her coming forward being based on her religious beliefs spurring her to be honest about what had occurred.**

Stephens argues that the deputy jailer's statements that Amy told him about the rape because "her religious journey and spiritual awakening compelled her to come forward and be truthful . . . amounted to an assertion that [Amy] would be more likely to be telling the truth because of her religious faith" as prohibited by KRE 610. The Commonwealth argues that "[j]ust because [Amy] was, in [the deputy jailer's] view, choosing to disclose in part because of her religious beliefs does not make it so prejudicial as to where the jury was more likely to believe her story[,]" and defends these statements as "not [being] made for the explicit purpose of enhancing her credibility."

Our rules clearly prohibit bolstering a witness's credibility based upon religious belief. KRE 610 provides: "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." *See generally Allen v. Commonwealth*, 286 S.W.3d 221, 232-33 (Ky. 2009) (discussing limits on references to religious matters).

22

The deputy jailer testified as follows regarding this topic:

Q: [Amy's] a different child now, she started out so reserved but at some point, you said she never went home, and at some point she did come to you and made a very specific report, can you tell us about that?

A: She, she began praying, her, my daughter and her began praying at about the same time at church, they prayed at the altar, we attend church a lot, she, she, she really devoted herself to try to seek the Lord and she came to a point, she came to my wife one day . . . and she told my wife that she had been raped and by who and said she was coming forward now because in her spiritual race she felt like if she didn't speak the truth—because we asked her in past, "Has anybody touched you?" and she didn't want to go there, and to her she felt like she was living a lie by not being honest. So, she told my wife first, my wife called me in the room, we, the three of us together and [Amy] explained to me what she had just explained to my wife. And she said that she didn't feel like she could get any closer to God until she spoke her truth and was honest about what she'd been through.

Although the deputy jailer appears to have testified about Amy's religious journey as it interfaced with why she told them about rape rather than to deliberately bolster the credibility of Amy's statements as truthful, his intent is not important. We are concerned that such references could have the misleading effect of persuading members of the jury to believe Amy's account because it was spurred by her professed beliefs and her need to be honest with God. This type of vouching based on religious belief is of course prohibited and improper and should have been excluded.

### (c) Byrd should not have been permitted to vouch for Amy's credibility directly and based on the details she gave regarding the rape.

Stephens argues that Byrd could not properly vouch for Amy's credibility. The Commonwealth argues that by providing a caveat for her opinion and

23

generally stating that there was no reason not to believe "a child" rather than Amy specifically, any bolstering by Byrd had minimal impact.

The objectionable testimony from Byrd is as follows:

Q: Did [Amy] communicate her story well?

A: Very well.

Q: In terms of details?

A: Yes.

. . . .

Q: Did you find [Amy's] story [regarding the rape] to be credible?

A: Yes.

Q: Is that part of your job, to determine, to make some judgments in order to guide your recommendation?

A: It is not. I can't say whether she was telling the truth or not but with my education and background I have no reason to believe that the child would lie about such serious allegations with detail.

Byrd later testified in direct and on cross-examination that no part of Amy's testimony was foggy, Amy was certain about the details and Amy was not unclear about anything.[7]

---

[7] This testimony built upon prior testimony by the deputy jailer that Amy was able to give a detailed report. The Commonwealth Attorney previously asked him if Amy was able to give him specific details, which resulted in his extensive monologue relating all she had related about the rape. The Commonwealth Attorney repeatedly returned to the topic of whether Amy had been able to give specific details:

Q: Okay, and so when she describes specifically what had happened to her, are you telling all of us that she gave graphic details?

A: She did; she did to me . . . .

The Commonwealth Attorney commented before another question, "So the details, even though she was a child, the details were there[.]"

24

Byrd's initial statement that she found Amy's story credible constituted improper vouching. While Byrd initially appeared to correct this statement when she stated "I can't say whether she was telling the truth or not[,]" Byrd then backtracked from this correction to say that she had "no reason to believe the child would lie about such serious allegations with detail" and then to confirm that Amy was certain about the details. In the context of Byrd's whole statement, we have no difficulty inferring that her statements were all understood to refer to Amy and not just a general child victim. This was both direct and indirect vouching for Amy's credibility and is prohibited.

### (d) Deputy Sturgill should not have been permitted to vouch for Amy's credibility directly and comment on the county attorney believing her.

While Stephens has not raised this as an error, there is one further example of how palpable error occurred in permitting a witness to vouch for Amy's credibility. Detective Sturgill specifically testified that after hearing Amy's interview with Byrd, he believed there was probable cause, he immediately went to talk to the county attorney; and the county attorney issued a warrant. When asked if having a warrant issued immediately was typical, he explained "if they [the county attorney] hear what we have to say and they believe it as well, they'll go ahead and issue the warrant." The following exchange then took place:

Q: Was there any particular reason that you decided to get the arrest warrant immediately?

A: After hearing [Amy's] story and listening to her and listening to some of the facts that she provided in the case, I, *I fully believed*

25

*her story* and went over and talked to the county attorney and that's why we issued the warrant.

(Emphasis added).

The testimony about Detective Sturgill believing there was probable cause, his statement that the county attorney believed Amy's statement (as related through Detective Sturgill) and that Detective Sturgill "fully believed her story" were all examples of inappropriate vouching for Amy's credibility, with the last example being direct vouching with no other possible interpretation. This is clear error.

### 3. Victim Impact Evidence

Stephens argues that the deputy jailer's testimony about the effects that the rape had on Amy, "including her night terrors, inability to sleep, and her concern about working a local job where she might encounter [Stephens][,]" constitutes "prototypical victim impact evidence, which is not permitted in the guilt phase of trial."[8] The Commonwealth denies that the deputy jailer's testimony about the effects the rape had on Amy were victim impact statements and defends their use as being simply that of background information about the victim.

---

[8] These were not the only statements that could be considered victim impact testimony. The deputy jailer also opined that Amy had been through a "severely traumatic" experience involving "things that will follow her adulthood, [Amy] will be into her mid-twenties and only with the help of the Lord will she be able to overcome the things that her past has given her." Additionally, Amy testified that in the days immediately after the rape she was "numb mentally" and unsure why she was "still on the earth if life was going to be like this."

As we recently reiterated in *Alderson v. Commonwealth*, 670 S.W.3d 884, 893 (Ky. 2023) (quoting *Tackett v. Commonwealth*, 445 S.W.3d 20, 33 (Ky. 2014)), "victim impact evidence masquerading as victim background evidence is not permissible as the 'introduction of victim impact evidence during the guilt phase is reversible error.'" To sort out whether evidence is victim impact evidence or victim background evidence, we examine "whether the evidence is 'aimed primarily at appealing to the jurors' sympathies' or 'providing an understanding of the nature of the crime[.]'" *Id.* (quoting *Tackett*, 445 S.W.3d at 33). "'[H]ighly inflammatory' evidence with 'little or no probative value' which concerns the 'terrible loss' suffered based on the crime is not appropriate for introduction during the guilt phase of a trial." *Id.* (quoting *Ice v. Commonwealth*, 667 S.W.2d 675-76 (Ky. 1984)). In a case in which the resolution depends upon whether the victim or the defendant should be believed and other evidence is lacking, the perception of the child as a victim who suffered "would arouse the jurors' sympathy and could result in a verdict rooted in that sympathy rather than based on the evidence properly admitted." *Id.* at 894.

As was the case in *Alderson*, the information about how the crime affected Amy "was not background evidence . . . and was not relevant to establish the underlying crime. There is no acceptable justification whatsoever for admitting victim impact testimony at this phase of the criminal trial[.]" 670 S.W.3d at 895. Such statements' only purpose was to serve to potentially goad the jury into making a ruling not based on the evidence but based on their

sympathies. The trial court erred in permitting such testimony to be introduced during the guilt phase of the trial.

**B. These Cumulative Errors are Palpable and Warrant Reversal.**

Although the Commonwealth generally does not admit that errors occurred regarding hearsay bolstering, vouching, and permitting the use of victim impact evidence during the guilty phase of the trial, it repeatedly argues that if we determine errors occurred, these unpreserved errors are not palpable. We disagree.

> Under [the Kentucky Rules of Criminal Procedure (RCr)] 10.26, an unpreserved error may only be corrected on appeal if the error is both "palpable" and "affects the substantial rights of a party" to such a degree that it can be determined "manifest injustice resulted from the error." For error to be palpable, "it must be easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth,* 206 S.W.3d 343, 349 (Ky. 2006). The rule's requirement of manifest injustice requires "showing . . . [a] probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky. 2006). Or, as stated differently, a palpable error is where "the defect in the proceeding was shocking or jurisprudentially intolerable." *Id.* at 4. Ultimately, "[m]anifest injustice is found if the error seriously affected the fairness, integrity, or public reputation of the proceeding." *Kingrey v. Commonwealth,* 396 S.W.3d 824, 831 (Ky. 2013) (quoting *McGuire v. Commonwealth,* 368 S.W.3d 100, 112 (Ky. 2012)).

*Young v. Commonwealth,* 426 S.W.3d 577, 584 (Ky. 2014).

If hearsay bolstering occurs where the victim's credibility is crucial to the Commonwealth's case, such an error can be palpable. *Chavies,* 374 S.W.3d at 323; *Hoff,* 394 S.W.3d at 377; *Alford,* 338 S.W.3d. at 246. In fact, unpreserved hearsay bolstering errors, when combined with other unpreserved errors, warranted reversal in *Chavies, Hoff,* and *Alford. Chavies,* 374 S.W.3d at 323-

28

24; *Hoff*, 394 S.W.3d at 379; *Alford*, 338 S.W.3d. at 246-47. "[Vouching] testimony by a respected professional gives extra weight to the child victim's testimony and serves to unfairly prejudice the defendant." *Hoff*, 394 S.W.3d at 379.

### 1. Hearsay Statements

In this case, the admission of this hearsay evidence was highly damaging to Stephens because the only evidence in this case revolved around Amy's account of the rape, whether directly testified to by her, or testified to by the deputy jailer or Byrd based on Amy's statements. Stephens denied committing this crime and provided a reasonable basis for why it would have been extremely difficult for him to commit this crime during the timeframe Amy identified.

The Commonwealth points out minor differences between the deputy jailer's account of Amy's rape and her testimony, such as the fact that the deputy jailer stated Amy's mother told her she was leaving her with Stephens so Amy's mother could go to Walmart. The Commonwealth argues a bolstering hearsay error cannot be palpable when differences occur between a hearsay account and testimonial account of the crime committed against the victim.[9] We reject the Commonwealth's premise. Whether such an error is palpable depends not on whether accounts are identical but on the effect of the hearsay

---

[9] The Commonwealth relies on an unpublished case in support of this proposition. We remind the Commonwealth that it is not appropriate to cite to unpublished cases when there are published cases on point. *See* Kentucky Rules of Appellate Procedure (RAP) 41(A)(3).

admitted. Undoubtedly, any hearsay recitation is likely to vary at least slightly from that of the victim testifying directly about what occurred, but such variations *do not* prevent such testimony from being bolstering. There may be occasions when such an error is not palpable because the accounts differ so greatly that the erroneously admitted hearsay testimony either harms the victim's credibility or at least partially neutralizes the efficacy of the erroneously admitted testimony. However, this is not one of those situations.

We also reject the Commonwealth's supposition that we can ignore such an error because the jury most likely relied on Amy's testimony in rendering its guilty verdict. The whole problem is that given such serious evidentiary errors, we do not know whether the jury relied on admissible or inadmissible evidence in rendering its verdict.

We disagree with the Commonwealth that the error in Byrd naming Stephens as Amy's rapist could not be palpable because there was no dispute as to who Amy's alleged rapist was. While Amy may have been certain in her identification, there was in fact a dispute as to the identity of any purported rapist because Stephens denied raping Amy. Additionally, Byrd's testimony endorsing Amy's identification of Stephens as Amy's rapist had the potential to be given additional weight by the jury due to her status as a trained and experienced professional forensic interviewer who had conducted numerous interviews and followed the protocol in conducting such interviews as provided in her forensic interview training.

30

The Commonwealth has not persuaded us that the deputy jailer's detailed hearsay account of Amy's rape and Byrd's testimony identifying Stephens as the rapist are not palpable errors. No appropriate grounds justified such testimony, the violation of our evidentiary rules is clear, and such severe violations are quite prejudicial.

## 2. Vouching Statements

Additionally troubling is testimony in which the deputy jailer, Byrd and Detective Sturgill vouched for Amy's credibility. All three witnesses were respected professionals, which undoubtedly could provide a reason for members of the jury to trust their opinions. While the deputy jailer was mostly not testifying in his professional capacity, Byrd and Detective Sturgill were testifying as purported neutral and experienced professionals. The jury may have especially valued Byrd's and Detective Sturgill's opinions that Amy was credible.

The deputy jailer's vouching testimony about Amy's certainty regarding the identity of her rapist if considered alone may not be palpable. However, when combined with his testimony that Amy "confessed" what had happened in conjunction with her religious beliefs, this is very concerning.

As to Byrd, the inference that Amy's detailed account made Byrd believe Amy could have resulted in the jurors substituting Byrd's opinion for their own, rather than independently concluding for themselves that they believed Amy. While Amy's detailed account could be a reason for the jurors to believe

31

her, such a conclusion would need to be the result of their own judgment, rather than derived from Byrd's.

As to Detective Sturgill's testimony, it was even more inappropriate and damaging than Byrd's in vouching for Amy's credibility. Detective Sturgill told the jury that both the county attorney and he believed Amy's account, with Detective Sturgill specifically testifying "I fully believed her[.]" The belief trusted law enforcement and prosecuting professionals who had likely seen many similar cases was powerful. Given such testimony, there was a very real danger that the jurors chose to substitute the judgment of the detective and the county attorney for their own.

The jury was advised they should believe Amy because the deputy jailer, Byrd, Detective Sturgill and the county attorney did, while Stephens stood alone in claiming his innocence. This combined vouching testimony was highly prejudicial to Stephens.

### 3. Palpable Error is Established

When we consider these errors together, we are satisfied that reversal for palpable error is warranted because the admission of such evidence "jumps off the page" and "cries out for relief." *Chavies*, 374 S.W.3d. at 323-24 (quoting *Alford*, 338 S.W.3d at 251 (Cunningham, J., concurring)). As occurred in *Hoff*, we believe the combined extensive improper hearsay bolstering and vouching testimony "tipped the scales against the defendant to the extent that the trial was fundamentally unfair, thus rising to a manifest injustice" and requiring reversal. *Hoff*, 394 S.W.3d at 378-79. Amy made a very credible witness, but

32

we cannot say the result would have been the same without the additional testimony adding weight to her side of the credibility scale.

While the victim impact evidence alone may not have been palpable, when considered along with the hearsay bolstering and vouching testimony, a picture emerges of a very unfair trial. Therefore, reversal for a new trial is necessary.

## C. Additional Issues

We address Stephens's other claimed errors to the extent they are liable to reoccur on retrial, to provide guidance.

### 1. The Character Evidence Regarding Prior Violence Toward Amy and her Family was Inextricably Intertwined with the Crime Under these Specific Circumstances but Should Properly be Limited on Remand.

Stephens argues that evidence of his prior bad acts in abusing Amy and her family as testified to by the deputy jailer and Amy should have never come before the jury as the Commonwealth failed to provide any notice of its intent to elicit such testimony as required by KRE 404(c). Stephens also argues that these prior bad acts were not admissible pursuant to KRE 404(b) because Stephens's alleged physical abuse of Amy's mother, brother and Amy does not make it more probable that he raped Amy. He argues that Amy's reasons for not wanting to go to Stephens's home were irrelevant as she feared physical abuse and not being raped.

The Commonwealth argues that the evidence of physical abuse was appropriate because it showed intent, a common scheme and was inextricably intertwined with other evidence.

33

During the deputy jailer's testimony, Stephens failed to make any objection to his testimony that Amy told him that she had not wanted to go to Stephens's home because Stephens had previously assaulted her when she tried to intervene when he was hurting her mother and his testimony that she had a black eye, told the counselor what happened, and that Stephens went to jail for doing that. Stephens did object when Amy testified that he repeatedly hit her mom and had hit her when she tried to intervene. However, this objection only related to KRE 404(b) and not KRE 404(c).

KRE 404(b), which concerns character evidence regarding "other crimes, wrongs, or acts[,]" provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

"In order to determine if other bad acts evidence is admissible, the trial court should use a three-prong test: (1) Is the evidence relevant? (2) Does it have probative value? (3) Is its probative value substantially outweighed by its prejudicial effect?" *Leach v. Commonwealth*, 571 S.W.3d 550, 554 (Ky. 2019). "[A]fter determining relevancy and probativeness, the trial court must weigh the prejudicial nature of the 'other bad acts' evidence versus its probative value. Only if the potential for undue prejudice substantially outweighs the probative

34

value of the evidence must it be excluded." *Id.* "The prejudice must go beyond that which is merely detrimental to a party's case and be of such character that it 'produces an emotional response that inflames the passions of the triers of fact or is used for an improper purpose.'" *Kelly v. Commonwealth*, 655 S.W.3d 154, 165 (Ky. 2022) (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25[3][d], at 135 (4th ed. 2003)). Such evidence "is, of course, prejudicial to [the defendant] as all evidence of culpability is in a criminal proceeding" but is still properly admissible so long as it is not "*unduly* prejudicial because it is not unnecessary or unreasonable." *Luna v. Commonwealth*, 460 S.W.3d 851, 873 (Ky. 2015) (footnote omitted).

We agree that the Commonwealth should have provided notice to Stephens that it planned to seek to admit prior bad acts testimony. It must do so on remand.

We disagree with the Commonwealth that any past physical abuse was tied to intent to rape Amy because there was no evidence that any of this past physical abuse was of a sexual nature or that Stephens had previously threatened any sexual violence. We also disagree that past physical violence was part of a common scheme with the rape that occurred here.

However, we agree that the evidence about the previous physical violence, while it was evidence of previous crimes and character evidence, was at least in part not improperly admitted here because it was inextricably intertwined with rape. This evidence explained why Amy was afraid of Stephens but did not disobey her mother and took the pill and remained in Stephens's

35

home as instructed. Amy's testimony implied she believed that if she disobeyed her mother or objected in front of Stephens that Stephens would hit her. Amy taking the pill to avoid being hit was significant, and the pill itself was significant as it was potentially some kind of drug which would facilitate Stephens raping Amy or obscure her memory of the event afterwards. Thus, Amy's reasons for taking the pill and remaining in Stephens's residence despite her fears of physical violence were inextricably intertwined with the sexual assault upon her under these facts.

As we ruled that the deputy jailer should not have testified about Amy's hearsay statements, he likewise should not have been permitted to testify about Stephens hitting Amy, her brother and her mother, about Amy reporting the incident and about Stephens going to jail for the incident. Even had this not been hearsay, any criminal consequences were irrelevant to Amy's fears. We also note that other bad acts testimony was introduced and the proper scope of that should be considered.[10]

On remand, the Commonwealth shall provide appropriate pretrial notice in conformance with the requirements of KRE 404(c) should it wish to introduce such evidence again. The Commonwealth has a duty to conform its

---

[10] Some of this evidence may be permissible to Stephens because it supported his position that he could not commit the crime because he was incarcerated. Stephens also opened the door to some evidence through his own questions. Examples of this other bad acts evidence included that Stephens was incarcerated when Detective Sturgill interviewed him and Amy's mother had a DVO against Stephens (a fact Stephens elicited during his cross-examination of Detective Sturgill, which was then raised by the Commonwealth Attorney during the cross-examination of Stephens).

actions to what our evidentiary rules require. A pretrial notice gives the parties an appropriate framework for addressing the scope of what is proper in advance of trial. The trial court may wish to limit this testimony to alleviate at least some potential prejudice to Stephens and issue a limiting instruction to the jury, if the defense agrees this would be appropriate.

**2. Other Background and Religious Testimony by the Deputy Jailer**

We agree with Stephens that the amount and type of background information that the deputy jailer testified to was excessive and largely irrelevant. The testimony regarding the deputy jailer's religious observance was not pertinent to the issues that the jury needed to resolve and had the potential danger that it could provide a basis for believing the deputy jailer. While some background information about Amy, her life and her relationship with the deputy jailer is appropriate, the total volume and content should be more limited in a future trial.

**3. Asking Stephens to characterize the testimony of Amy as lying or "making up a story" was inappropriate.**

Stephens argues it was improper during his cross-examination for the Commonwealth Attorney to try to get him to characterize Amy as lying about being hit by him and asked if she was lying about her brother being hit as well. Having reviewed the testimony, the Commonwealth Attorney asked Stephens about Amy "making up" a story about the physical abuse of her brother after Stephens himself stated that Amy "made it up." It was Stephens that then stated, "it's a lie." Then the Commonwealth Attorney repeated "a lie?" to which Stephens then confirmed "yes." The Commonwealth Attorney then asked about

the rape allegations, restating Amy's testimony and asking "[t]hat was a pretty big story for a twelve-year-old, wasn't it?" Then when Stephens confirmed that it was, the Commonwealth Attorney asked "[b]ut she made it up, right?" and then later asked if Amy was a "wonderful storyteller."

In *Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky. 1997), our Court stated plainly:

> A witness should not be required to characterize the testimony of another witness . . . as lying. Such a characterization places the witness in such an unflattering light as to potentially undermine his entire testimony. Counsel should be sufficiently articulate to show the jury where the testimony of the witnesses differ without resort to blunt force.

However, the Commonwealth can inquire as to what the defendant means by his testimony when the version of events testified stands in stark contrast with that to which the victim testified. *See Graham v. Commonwealth*, 571 S.W.3d 575, 584–85 (Ky. 2019). The wording of "making that up" and telling "stories" when asking new questions (rather than just clarifying Stephens's testimony) is essentially the same as characterizing Amy as lying. This was improper. On remand, the Commonwealth Attorney must use more care in the wording of questions.

### 4. The Commonwealth Attorney Improperly Referred to Matters Not in Evidence During the Closing Argument.

Stephens argues the Commonwealth Attorney erred by referring to matters which were not in evidence by erroneously stating the jury had heard that 88% of sexual abuse against children goes unreported and by stating that Amy testified that part of her motive for reporting the rape was to protect

38

others. We agree that these statements were made in error as neither was supported by the evidence produced at trial. Now that these errors have been identified, they should not reoccur on remand.

**5. Information about dismissed or reduced charges should not be provided to the jury during the penalty phase.**

We agree that providing information during the penalty phase about charges that were different than Stephens's prior convictions was inappropriate as explained in *Blane v. Commonwealth*, 364 S.W.3d 140, 152 (Ky. 2012), *abrogated on other grounds by Roe v. Commonwealth*, 493 S.W.3d 814 (Ky. 2015), but believe that now that this error has been identified it will not reoccur on retrial.

### III. CONCLUSION

We reverse and remand the judgment and sentence of the Harlan Circuit Court because palpable error occurred when witnesses were allowed to testify about Amy's hearsay statements regarding the rape, bolster her credibility through vouching testimony, and testify about the impact the crime had on her during the guilty phase.

Although Stephens did not object to various errors committed during his trial, we wish to emphasize that a defense attorney abdicating required duties[11]

---

[11] We echo the prior words of our Court: "Why defense counsel was complacent with the prosecutor's conduct is unknown to this Court. Nevertheless, 'the defense lawyer is not the only lawyer in the courtroom who has an obligation to follow the rules of evidence and pursue the ends of justice.'" *Chavies*, 374 S.W.3d at 324 (quoting *Alford*, 338 S.W.3d at 251 (Cunningham, J., concurring)). If we had not found such errors palpable, Stephens would have a strong postconviction claim pursuant to RCr 11.42 for receiving ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 694 (1984), because there is a reasonable probability that

should not result in the Commonwealth Attorney introducing evidence that is clearly inappropriate, prohibited and will deprive the defendant of a fair trial.

As explained in *Caudill v. Commonwealth*, 374 S.W.3d 301, 309 (Ky. 2012):

> Prosecutors have a special role in the judicial system. Unlike other attorneys, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate." See Model Rules of Prof'l Conduct R. 3.8 cmt. 1. The sovereign, represented in a criminal trial by the prosecutor, has an interest "not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

Commonwealth Attorneys should not rely on the hope that known errors they make will not be considered palpable on appeal but should instead engage in best practices. When errors in the admission of evidence are as obvious and rampant as they are here and defense counsel repeatedly fails to make an objection, the trial court should consider intervening in the interest of seeing that justice is done.

All sitting.  All concur.

---

absent such errors in failing to object to this testimony the result of the jury trial would have been different. An evidentiary hearing likely would be required to resolve whether Stephens's counsel's failure to object "was trial strategy, or 'an abdication of advocacy.'" *Hodge v. Commonwealth*, 68 S.W.3d 338, 345 (Ky. 2001). However, we have serious doubts that a deliberate choice not to object to the widespread introduction of blatantly improper testimony could constitute a valid trial strategy. While sometimes counsel may not want to draw a jury's attention to prejudicial evidence by objecting to it, the evidence at issue here was extremely detrimental, unequivocally inadmissible, and undoubtedly harmful.

COUNSEL FOR APPELLANT:

Aaron Reed Baker
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Rachel A. Wright
Assistant Solicitor General